UNITED STATES of America
ex rel. Frank PETILLO,
Petitioner,

v.

STATE OF NEW JERSEY et al.,
Respondents.

Angelo ALBANESE, Petitioner,

v.

Howard YEAGER et al., Respondents.

Civ. A. Nos. 1252–73, 1808–73.

United States District Court,
D. New Jersey.

Sept. 12, 1975.

As Amended Sept. 18, 1975.

**1154**

Stanley C. Van Ness, Public Defender by Rosemary K. Reavey, Asst. Deputy Public Defender, for petitioner Petillo.

Joseph P. Lordi, Essex County Prosecutor by R. Benjamin Cohen, Asst. Prosecutor, for respondents State of New Jersey, and others.

Noonan & Flynn by Robert J. DeGroot, Newark, N. J., for petitioner Albanese.

Joseph P. Lordi, Essex County Prosecutor by Kenneth P. Ply, Asst. Prosecutor, for respondents Howard Yeager, and others.

## OPINION

STERN, District Judge.

Petitioners seek writs of habeas corpus pursuant to the provisions of Title 28 U.S.C. § 2254. Petitioner Petillo commenced Civil Action No. 1252–73 on August 28, 1973. Petitioner Albanese began Civil Action No. 1808–73 on December 14, 1973. The two actions were consolidated by order of the Court on November 22, 1974, on consent of all parties, on the basis of the applicability to both of the common question of law known in this State as the "Petillo Rule." Federal Rule of Civil Procedure 42(a).

### I. PROCEDURAL HISTORY

The Essex County Grand Jury charged Petitioner Petillo, in Indictment Nos. 3853–70 and 3854–70, with unlawfully keeping a place to which persons may resort for gambling, and with bookmaking, in violation of N.J.S.A. 2A:112–3.

A pretrial motion to suppress evidence seized pursuant to a search warrant signed by a judge of the Superior Court was denied on November 13, 1970. Petitioner filed a petition for leave to appeal from that ruling, which was denied on December 9, 1970. He was tried and convicted by a jury in Superior Court, on both charges, on February 17 and 18, 1971. Petitioner was sentenced, on March 18, 1971, to a term of one-to-three years in the State Prison and a $2,000 fine for bookmaking, and to a concurrent one-to-three year term for

keeping a place to which persons may resort for gambling.

Petitioner appealed to the Appellate Division of the Superior Court, and the appeal was certified by the Supreme Court of New Jersey before argument in the Appellate Division. The convictions were affirmed by the Supreme Court on July 5, 1972. *State v. Petillo*, 61 N.J. 165, 293 A.2d 649 (1972). On February 20, 1973, a petition for a writ of certiorari was denied by the Supreme Court of the United States, Mr. Justice Douglas dissenting. *Petillo v. New Jersey*, 410 U.S. 945, 93 S.Ct. 1393, 35 L.Ed.2d 611 (1973). Petitioner Petillo has thus exhausted all available state remedies, within the meaning of Title 28 U.S.C. § 2254(b).

The Essex County Grand Jury charged petitioner Albanese, in Indictment No. 373–71, with the following offenses: Count 1, possession of lottery slips, in violation of N.J.S.A. 2A:121–3; Count 2, keeping a place to which persons may resort for gambling, in violation of N.J.S.A. 2A:112–3; Count 3, working for a lottery business, in violation of N.J.S.A. 2A:121–3; and Count 4, bookmaking, in violation of N.J.S.A. 2A:112–3. Petitioner was tried before a jury in Superior Court from March 7 to March 13, 1972. A mistrial was declared after the jury was unable to agree on a verdict. On April 17, 1972, petitioner, on the ground of newly discovered evidence, moved for leave to file out of time a motion to suppress evidence. The motion was denied on May 1, 1972. Petitioner was retried and convicted in Superior Court, and was sentenced on July 13, 1972 to a term of one-to-two years on Count 1, two-to-three years on Count 2, one-to-three years on Count 3, and two-to-three years

on Count 4, all terms to run concurrently with the term imposed on Count 2. Petitioner's conviction was affirmed by the Appellate Division on September 20, 1973, in reliance on *State v. Petillo, supra,*[1] and his petition for certification was denied by the New Jersey Supreme Court on November 27, 1973. Petitioner Albanese has thus exhausted all available state remedies, within the meaning of Title 28 U.S.C. § 2254(b).

■■ Petitioner Petillo is presently on parole, but he is still "in custody" within the meaning of § 2254. Although the custody requirement has been interpreted broadly in recent years, *cf. Preiser v. Rodriguez*, 411 U.S. 475, 486 n. 7, 93 S.Ct. 1827, 36 L.Ed.2d 439 (1973), "there still remains as a requirement of the habeas corpus jurisdiction of a district court that the petitioner be subject to some 'physical restraint.'" *Id.* at 486, 93 S.Ct. at 1827. "This need not be actual confinement, but can include supervisory control over the person of the petitioner." *Pueschel v. Leuba*, 383 F.Supp. 576, 579 (D.Conn. 1974). Sufficient "supervisory control" has been found where a defendant was released on personal recognizance pending sentencing, *Hensley v. Municipal Court*, 411 U.S. 345, 93 S.Ct. 1571, 36 L.Ed.2d 294 (1973), or awaiting trial, *United States ex rel. Russo v. Superior Court*, 483 F.2d 7, 12 (3rd Cir. 1973), *cert. denied*, 414 U.S. 1023, 94 S.Ct. 447, 38 L.Ed.2d 315 (1973). The Supreme Court has held that "while [a] petitioner's parole releases him from immediate physical imprisonment, it imposes conditions which significantly confine and restrain his freedom; this is enough to keep him in the 'custody' of the members of the . . . Parole Board within the meaning of the habeas corpus statute

---

1. "The motion to suppress was not made within the time limitations of R. 3:5–7(a) and no good cause was shown for enlargement of the time. Nevertheless, the court heard defendant's argument on the merits and correctly refused to permit defendant to introduce testimony to controvert factual assertions in the affidavit on which the search warrant was based. *State v. Petillo*, 61 N.J. 165, 293 A.2d 649 (1972). We find no error in the denial of the motion to suppress."
*State v. Albanese*, No. A–2989–71 (App. Div.1973), at 2.

**1156**

. . . ." *Jones v. Cunningham*, 371 U. S. 236, 243, 83 S.Ct. 373, 377, 9 L.Ed.2d 285 (1963) (construing Title 28 U.S.C. § 2241). Petitioner Petillo, who is presently on parole, thus satisfies the "in custody" requirement. *United States ex rel. Wojtycha v. Hopkins*, 517 F.2d 420, 423–424 (3rd Cir. 1975).

■ Petitioner Albanese is presently at liberty until further order of the Court, having posted a $5,000 surety bond pursuant to an order of this Court filed on December 19, 1973. (Whipple, J.) Under *Hensley* and *Russo, supra,* petitioner Albanese is therefore also "in custody" within the meaning of the habeas corpus statute. The Albanese petition was ordered reassigned to this Court by Chief Judge Whipple on October 23, 1974, because of the pendency of the Petillo petition here and the New Jersey courts' reliance on the "Petillo Rule" in affirming the conviction of Albanese.

The legal issues presented by the two petitions are closely related. Each petitioner claims that evidence was seized from him under the authority of a search warrant which had been procured by police perjury in the underlying affidavit, and that the evidence so obtained was then used against him at trial. Petitioners further contend that due process was denied them because they did not receive a fair opportunity in state court to demonstrate that each issuing magistrate had been deceived, and that each warrant had been fraudulently procured.

Petillo, who was granted some opportunity to be heard in state court, alleges that the hearing there was neither full nor fair, and that the state court's factual findings after the hearing were not fairly supported by the record. Albanese, who was not afforded any hearing, alleges that his due process rights were thereby violated.

On appeal of the state convictions, the New Jersey Supreme Court in *Petillo,* and the Appellate Division in *Albanese* (in reliance on *Petillo*), found no due process violation. The basis for that conclusion was the Supreme Court's holding in *Petillo* that as a matter of law a defendant in a criminal case is not entitled to *any* hearing on his claim that the search warrant used to procure evidence against him was itself procured by police perjury, and that the use of such a warrant would not offend the Fourth Amendment:

> [F]or future guidance [we] feel obliged to deal with the basic question whether the truth of the factual assertions contained in the affidavit submitted in support of an application for a search warrant may be controverted on a subsequent motion to suppress the incriminatory evidence seized in the execution of the warrant. We hold that it may not be done.

> \* \* \* \* \* \*

> [T]he Constitutions are satisfied if a judicial mind decides that the sworn factual allegations set out in the affidavit or testimony sworn to before him show the required probable cause. . . . [T]hen the legal propriety of the issuance of the warrant ought to be beyond further question.

> \* \* \* \* \* \*

The requirement is sworn statements of fact of sufficient legal quality to persuade an impartial judge that probable cause exists to believe that the crime described is being committed at the place. Once that test is met to the satisfaction of the judge, relitigation of the truth of the factual basis for *issuance* of the warrant should not be permitted. The ultimate truth of the criminal charge against the accused is not involved on a suppression motion. On the contrary his effort is to avoid the evidence of that truth which provides corroboration of the basic truthfulness of the affidavit. [Citations omitted]

In our view the constitutional safeguards are met when the impartial judge finds the affidavit for the warrant credible and legally sufficient. Compliance with the requirement for

an oath by the officer must be regarded as a procedurally adequate manifestation of his veracity. That oath followed by the judge's determination that the facts vouched for show probable cause are all the Constitutions demand and guarantee to our citizens. If the police officers lie, the truth of the accused's alleged criminal activities as revealed by the evidence seized under the warrant will not be diluted. In that event, as the Chief Justice noted in *State v. Burnett, supra* [42 N.J. 377, 201 A.2d 39], the accused will have to meet nothing more nor worse than the "truth" at a plenary trial. 42 N.J. at 386, 201 A.2d 39. Further, so far as the untruthful officers are concerned, they expose themselves to the sanctions of indictment for perjury or false swearing, a charge of criminal contempt, and assessment of monetary damages in a civil action.

*State v. Petillo*, 61 N.J. 165, 173–174; 293 A.2d 649 (1972), *cert. denied*, 410 U.S. 945, 93 S.Ct. 1393, 35 L.Ed.2d 611 (1973). (Emphasis in original)

The first question presented, therefore, is whether the Supreme Court of New Jersey was correct in holding that as a matter of federal constitutional law, no adversary hearing was necessary because the Fourth Amendment is satisfied if a search warrant is based on an *ex parte* affidavit containing allegations facially sufficient to support the finding of probable cause, whether or not these allegations themselves are misrepresentations or even outright perjury by the police affiant. Although the State urges that the Court need not reach that question here (SB: 6), it has conceded before this Court that the decision in *State v. Petillo* is not correct, and that a warrant which depends for probable cause upon a perjurious police affidavit is invalid under the Fourth Amendment.[2]

■ The Court is reluctant to reach constitutional issues if there is any other basis for decision. *Cf. Siler v. Louisville & Nashville Ry. Co.*, 213 U.S. 175, 193, 29 S.Ct. 451, 53 L.Ed. 753 (1909). In the case at bar, however, if New Jersey's interpretation of the requirements of the Fourth Amendment, as set out in *State v. Petillo*, were correct, there would be no due process right to test the veracity of the supporting affidavit. The pending claim of petitioners would then be moot. No denial of due process could be found by this Court in the manner in which the New Jersey courts resolved petitioners' contentions if those issues are academic because the Constitution is indifferent to their resolution.

■ On the basis of the factual and legal analyses which follow, this Court concludes that the Fourth Amendment is violated when a materially inaccurate affidavit, knowingly submitted, forms the basis for the issuance of a search warrant. The Fourth Amendment requires that the proceeds of a search conducted pursuant to such a warrant be suppressed. This Court further finds that the subject of such a search cannot, consistent with due process, be deprived of a fair opportunity to vindicate this federally-guaranteed right, at least once he has made a *prima facie* showing of its violation. The

2. THE COURT: Do you agree that a warrant issued on "facts" which the judge at the time he issued the warrant believed to have been actual facts but later demonstrated to be either inaccurate or misstatements or worse, that a warrant issued on that kind of predicate is not a legal warrant?

MR. COHEN: No, I don't agree. Let me characterize my answer to that since that is one of the questions that you posed in your letter, as follows:

If there are allegations in support of an affidavit for a search warrant that are perjured and they are necessary to complete the probable cause test, then I will concede that such a warrant is not supportable. That so offends anyone's notion of justice that it cannot be maintained under our system.
Tr. 8/27/74: 40–41; *see* Tr. 8/27/74: 108. A different Assistant Prosecutor made a similar concession in *Albanese*. Tr. 10/24/74: 8, 17.

Court further finds, on the record before it, that these petitioners made such a showing, and that they were denied an adequate opportunity to demonstrate a violation of their constitutional rights.

## II. *FACTUAL BACKGROUND*

### A. *PETILLO*

The state court record reveals that on March 20, 1970, State Police Lt. Laurent H. Gauthier appeared *ex parte* before the Honorable Charles S. Joelson, Judge of the Superior Court, for the purpose of obtaining a warrant to search petitioner Petillo's two-story house at 326 Bloomfield Avenue, Bloomfield. Lt. Gauthier executed a lengthy affidavit before the judge in support of his application. In his affidavit, Gauthier stated that he was a member of the Organized Crime Task Force Bureau, North Unit, of the New Jersey State Police, and that he had been a member of the State Police for six years, during which time he had "investigated numerous gambling complaints throughout the State of New Jersey."

The affidavit states that Gauthier received "information from a reliable informant, whose information has proven to be reliable in the past and whose information has resulted in at least two gambling arrests." The affidavit relates that the informant "advised me that a certain male is conducting a gambling operation, namely Bookmaking and/or Lottery in a one-family house located at 326 Bloomfield Avenue . . . . . The informant further advised that he has placed numerous horse bets in the past with this individual over telephone number 429–9377, located in Bloomfield, N. J." Trooper Gauthier further swore that examination of telephone company records revealed that the number 429–9377 was listed in the name of "F. Petillo, 326 Bloomfield Avenue," as was an auxiliary number at the same address, 429–4933.

The Gauthier affidavit makes the following factual assertions in support of the application for a search warrant:

On Wednesday, March 4, 1970 at approximately 3:15 P.M. I the deponent met with the informant . . . . At this time the informant told the deponent that he could place a bet, more specifically a horse bet over telephone number 429–9377. At this time *I dialed telephone number 429–9377. The phone rang two times and was then answered by a male voice who stated hello. At this time I handed the phone to the informant who after identifying himself placed two horse bets with the person on the other end of the phone and then hung up.*

On Thursday, March 5, 1970 at approximately 10:00 A.M. I placed 326 Bloomfield Avenue . . . . under surveillance. This address is described as being a two story one family dwelling with white aluminum siding trimmed with black. There are blue awnings above both the front and side entrances. The number 327 appears on the house to the left of the front door. At approximately 11:25 A.M. I observed a late model black Oldsmobile, N. J. registration NLK 307 park in front of the house. A W-Male approximately 5–8 and wearing a brown leather jacket and grey pants emerged carrying a paper bag and went into the side entrance of 326 Bloomfield Ave. Surveillance was terminated at 2:00 P.M. This same date at approximately 2:30 P.M. the deponent met with the same informant . . . . At this time the informant told the deponent that he could place a bet, more specifically a horse bet over the phone number 429–9377. *At this time I dialed the above number 429–9377 and found the number to be busy.*

Approximately five minutes went by and *I again dialed the number 429–9377 and this time the phone rang once and it was picked up. A man's voice said hello and I immediately passed the phone to the informant. The informant identified himself and then placed a bet on a horse with the man on the other end of the phone.*

On Friday, March 6, 1970 at approximately 11:00 A.M. I again placed the house at 326 Bloomfield Avenue . . . under surveillance. At approximately 11:45 A.M. a late model black Oldsmobile, N. J. registration NLK 307 arrived and parked in front of 326 Bloomfield Avenue. The same white male . . . got out of this vehicle carrying a paper bag and a red trimmed newspaper and entered the side entrance of 326 Bloomfield Avenue . . . .

(Emphasis added)

The same man was observed leaving the same car and entering the house at 326 Bloomfield Avenue at 11:40 A.M. on March 9, 1970, according to the affidavit. The car was found to be registered to a Montclair resident.

Petillo filed a written motion to suppress, alleging "that this entire affidavit is vitiated by virtue of the fact that material portions thereof can be demonstrated to be false." (DB (prehearing): 2)

Upon Petillo's motion to suppress, the Court, over the State's objection, permitted the introduction of oral testimony to controvert the veracity of the Gauthier affidavit.[3]

Petitioner Petillo first called Mrs. Dorothy Waski, Assistant Manager of the Business Office for the New Jersey Bell Telephone Company in Montclair. According to her testimony, which was based on telephone company records she brought with her to court, the telephone number which Lt. Gauthier swore in his affidavit that he had called was unassigned on the days he swore he called it.

Mrs. Waski, a veteran of 27 years with the telephone company, testified that number 429–9377 was installed in petitioner Petillo's home on December 3, 1969. (Tr. 7/17/20: 25a) She further

stated, however, that company records showed that the number was changed on December 18, 1969, nearly three months before the calls the policeman claimed to have made, to 748–8869. (*Id.*) The company made this change on its own initiative and for its own convenience, in order to avoid billing problems caused by the different exchange assigned to Petillo's second line, 748–4933, which was also installed on or before December 3, 1969. (*Id.* at 25a–26a)

According to Mrs. Waski's testimony, on the two dates in question, March 4 and March 5, 1970, petitioner Petillo had two telephone numbers, 748–8869 and 748–4933. (Id. at 27a–28a) Petillo's old number, 429–9377, was unassigned on those dates. Mrs. Waski, with the telephone company records in hand, testified that if a call had been made to 429–9377 on those dates, a live or recorded female intercept operator would have intervened to report that the number dialed was no longer a working line. (*Id.*) She added that Petillo had not requested a transfer of calls to his new number, and that no such transfer would therefore have been provided. (*Id.* at 29a) According to the Waski testimony, all physical work necessary to effect the number change was done in the central office of the telephone company, and not at the Petillo home. (*Id.* at 40a–41a)

In answer to a question from the court, during cross-examination, whether the interception system could be circumvented by the customer, Mrs. Waski replied: "Anything is possible. But I wouldn't know how they would do it." (*Id.* at 49a) On redirect, Mrs. Waski noted that only if the tampering were performed by "a very knowledgeable person" could it be accomplished without alerting the telephone repair department. (*Id.* at 50a) In response to fur-

---

3. The judge who conducted the hearing expressed substantial doubt whether he had a right to grant a hearing on the veracity of the police affidavit sworn before a colleague, (Tr. 7/17/70: 17a) but refused to bar the testimony impeaching the statements in the affidavit. (*Id.* at 21a–22a) He reiterated his concern over this threshold issue before ruling on the motion after the evidence had been taken. (Tr. 11/30/70: 96a)

ther questioning by the court, she added:

> It is really—I think it would be very difficult. I don't want to say impossible, but I think it would be quite difficult, sir.

(*Id.*)

She was unable to say with certainty whether any illegal manipulation of the lines would have been discovered by the telephone company.

Lt. Gauthier, who had been excluded from the courtroom during Mrs. Waski's testimony, was called to the stand by petitioner. He reiterated that he did indeed dial 429–9377 on each of the two dates in question, and substantially restated the facts alleged in his affidavit in support of the search warrant. (*Id.* at 52a–53a) In addition, however, Lt. Gauthier testified that not only had he personally heard a male voice answer the phone on each occasion, then passed the receiver and heard the bets placed by the informant as sworn in his affidavit, he had also heard the responses at the alleged bookmaker's end of the line by cupping his ear to the phone while the informant talked. (*Id.* at 53a–56a) The Gauthier affidavit does not reflect the latter claim.

The State then applied for a continuance, in order to conduct an investigation to determine if it wanted to adduce additional testimony. The court adjourned the hearing until July 31, 1970, to permit the State to investigate. The State later notified the defense that it could produce no additional testimony. (DB: 3) After conducting an inquiry the State reported to the court that it did not wish to present evidence. (SSB: 4) The factual posture of the case at that juncture was summarized in a post-hearing brief filed by petitioner:

### FACTS

The defendant produced Mrs. Dorothy Waski, the Assistant Manager of the New Jersey Bell Telephone Company office in Montclair and the original telephone company records to establish the history of the telephones registered to the defendant for the following periods of time:

12/3/69 to 12/18/69 he had 429–9377

12/18/69 to 3/20/69 he had 748–8869 (Replaced 429–9377)

12/3/69 to 3/20/69 he had 748–4933 (Auxiliary number)

See pages 15–18 of transcript.

Therefore, on 3/4 and 3/5/70 the defendant had only two phones:

(1) 748–8869—the main number installed on 12/18/69

(2) 748–4933—the auxiliary number installed prior to 12/3/69.

See page 19.

The telephone 429–9377 was changed because the telephone company made an error. The defendant's proper exchange for his area was 748. Consequently giving him a 429 exchange would have caused trouble in the billing, hence the company having caught the error made the change on its own initiative. (17)

The telephone 429–9377 which was erroneously installed on 12/3/69 by the company and removed by the company on 12/18/69 was never again assigned to anyone. (19)

Consequently, if anyone on 3/4 or 3/5/70 called the number 429–9377 he would get a *female intercept operator* or a *computerized female voice,* (10) who would advise you that it was not a working number. (20) The *female intercept operator* would not greet the caller with hello or any other word and there would be no conversation between the female voice and the caller. (20) Since there was no strike or work stoppage on 3/4 or 3/5/70 a male operator could not be involved. (21)

\*　\*　\*　\*　\*　\*

The physical work in changing the telephone number was done in the central office and not at the customer's home. It is the wiring of the line

through the central office that causes the intercept operator to get the person dialing the number which was changed. (32) The records of the telephone company's plant, accounting, and directory departments as well as Mrs. Waski's office all received completed copies of the work order showing the change on 12/18/69 of the defendant's main line number from 429–9377 to 748–4933, hence they know the change was completed on 12/18/69. (33)

Mrs. Waski testified that if not impossible it would be quite difficult once 429–9377 was removed to circumvent the intercept operator. (40–41) *The writer notes that while the State posed this as a possibility, the State has since verified that once the number is changed in the central office, as Mrs. Waski testified, it no longer remains as a possibility.* In fact the State asked for time to present testimony along this line at the hearing of 7/17/70. *On two occasions since then, the last being October 5, 1970, the writer was advised that the State cannot present any testimony.*

DB:1–3 (Emphasis added)

In its post-hearing brief, submitted prior to oral argument, the State conceded the accuracy of defendant's factual summary:

## FACTS

*The facts in this case are substantially the same as indicated by defendant in his briefs, both previously and subsequent to the hearing.* However, the following facts should also be noted: As indicated in the affidavit, Trooper Gauthier has been a member of the N. J. State Police for the past six years and has investigated numerous gambling complaints throughout the State of N. J., and that based on his experience and expertise he expresses a belief and opinion that an illegal gambling operation is being conducted at 326 Bloomfield Avenue.

SB (motion): 1 (Emphasis added)

While conceding the facts alleged by the defendant, the State argued two points of law: first, that "[a]n attack upon the truth or falsity of the facts alleged in the affidavit is not authorized under New Jersey law" (SB (motion): 1); and second, that "[a]ssuming that none of the telephone calls had actually been made to the numbers indicated in the affidavit, . . . this affidavit contains sufficient information to establish probable cause, and thus, the warrant was [properly] issued." (SB (motion): 3) The matter was called for oral argument on October 23, 1970. Counsel for Petillo pointed out to the court that the State had conceded the falsity of the Gauthier affidavit:

MR. QUERQUES: . . . We have a perfect right to [attack the affidavit] and it would be a travesty of justice if we were denied that right to show a Court of competent jurisdiction that another Court was prevailed upon by way of perjury in order to secure an affidavit. Now, what is significant, if I may skip to my next point, what is significant about the State's brief, and I compliment Mr. Soller for it, is that they do not contest in any shape, manner or form the fact that the telephone in question was installed on December the third, and removed on December the eighteenth, 1969, and that on March 4th and 5th, when this state trooper says he called the number in question, he couldn't get the number; he would get a female intercept operator, and *while the State at the time of the original taking of testimony indicated that they may want to try to controvert that, they have now indicated to me and I made a little reference to it in my brief, that they cannot controvert, that the facts are as we proved them to be; the phone did not exist and you couldn't dial that number either at the location of the defendant or at any other location because the phone was not in use.*

\* \* \* \* \* \*

So, there is a concession, I think, in frank terms that that part of the affidavit is faulty, to be polite about it. Not to be polite about it, it is perjurious. Being accurate, it is perjurious.

But now the State says to you, "Well, Judge, the guts of this affidavit are false but you may still sustain this affidavit because there is enough information in the affidavit to make the affidavit worthwhile."

Let's see what the State says, because that's what is important. If your Honor turns to page three of their brief, they say first of all, that the informer was reliable because he had been involved in assisting in two prior arrests and they say that this reliability was buttressed by the fact that there were two arrests but, you Honor, that is not even scratching the surface of the problem. *I say this to you, the very existence of the informer is in question in this case. I suggest to you that there may not even have been an informer when you consider the rank perjury throughout the rest of the affidavit.*

\* \* \* \* \* \*

(Tr. 10/23/70: 78a–80a) (Emphasis added)

Petillo's attorney argued that to admit the falsity of the affidavit but yet to hold the warrant valid was both to deny the defendant his rights and to sanction an affront to the court.[4]

---

4. Now, it is somewhat—. . . . let me be polite again, surprising to have someone argue—. . . to a judge, that a man could face you, swear to tell the truth and lie to you not once but maybe fifteen times. It is surprising that he could get in the witness chair, not only repeat the lies that are in this affidavit, but go you one better: In the affidavit all he said was, "I dialed the number. The informer got on and I heard the informer place the bets."

When he came into your other courtroom, he said to you, because I asked him, "Did you cup your ear to the telephone and hear the other side of the conversation?

"Answer: Yes."

And then your Honor asked him, "Did you hear conversation from the other end of the telephone acknowledging the receipt of the wagers?"

He said, "Yes, I could tell."

Now, Judge, that is just about the boldest, rankest, ugliest lie that I have heard in a courtroom. What was he doing? What was the mentality and what was the motivation of this affiant, his thinking by himself, not knowing the testimony from the telephone people that we have produced: He didn't know that we had proven he lied. Not knowing we had proven he lied, he lied more to support what he put in his affidavit. . . . He never dialed that number and got a male voice because if you dialed the number, even as of the day of the hearing, going back to June 17th, when we were here, you would get a female intercept operator, so it is preposterous.

To say that though he lied about everything else, you should find enough integrity in this indictment—in this—excuse me —in this affidavit to support this affidavit, that just is somewhat shocking to me.

\* \* \* \* \*

And so what have you got? You've got questionable information from an informer who may exist and who may not exist and you have got a surveillance of no consequence because you can stand in front of anybody's house and see exactly the same thing.

So, that affidavit, sir, I think is one without any caliber or without any character. I don't think you can pull this fellow up by his bootstraps, but that is not the thing, frankly, that I really want to say to you. What I really want to say to you this morning is this. You and I and all the lawyers in this courtroom and all the Court attendants have seen in the course of their experience men prosecuted and indeed I will go so far as to say on this record, we have seen men persecuted for less, for less than what Mr. Gauthier, the trooper, the affiant in this case did.

I can't imagine that you, as a judge, could sit there in any case and hear a nondescript witness, not wearing a badge, get up there and say a pack of lies without your Honor saying, "Oh, wait a minute. What is going on here? Mr. Prosecutor, you better look into this. Something is wrong here. There is a crime being committed right in the presence of the Court."

So what is shocking is that from the commission of a crime, you could say that a valid search warrant has issued. The

The State then rose, and again explicitly conceded what it had conceded in its brief, that the policeman had not placed the calls:

> MR. SOLLER: . . . Now Mr. Querques indicates that you can't go behind what it states in the affidavit. Well, Mr. Querques did that on examination of Lt. Gauthier and *it is clear from his testimony that the evidence shows that at the time the telephone call he alleged that was made, and that he heard, couldn't have been made, and the State concedes that from the testimony elicited, this is true,* and I have spoken to the telephone company and they tell me that without collusion by someone in the telephone company, which the State says that it can't show, that the call made cannot be done without collusion.
>
> (Tr. 10/23/70: 89a–90a) (Emphasis added)

* * * * * *

> MR. SOLLER: . . . I do not think your Honor, this was done in bad faith, to lie on the stand, if indeed it was a lie.
>
> I honestly feel, whether or not the policeman was right or wrong, that he felt he was doing his job. *He exaggerated testimony and I have no question that he did not hear, unless there was collusion which we cannot prove, he did not hear anybody on the other end of the line.*
>
> He took the word of the informant, that the informant called; he heard the informant place a bet. *I think he took the informant's word.*
>
> (Tr. 10/23/70: 92a–93a) (Emphasis added) [5]

Petillo requested the production of the informant at the suppression hearing:

> THE COURT: Now, Mr. Querques, in line with the objection, as I indicated before, *this hearing is to be re-*

> man had no self respect for himself. He had no respect for Judge Joelson and, respectfully, I say to you, sir, when he got to this courtroom, the respect got down to scorn for this Court because he not only repeated the lies in the affidavit but he added to them. He added to them; so what do we do?
>
> I know my function, but what is the function of everybody else? Is it to pat him on the back? Is it to encourage that kind of lying? Is it to encourage that kind of police work, to support everything else in that affidavit as being truthful in face of positive and absolute knowledge that the guts of the affidavit, that the most important things in the affidavit, that the so-called eyewitness information in the affidavit, that the so-called acts of the affiant, what he actually did himself, they are all lies, they are all lies, but everything else is truthful.
>
> It is shocking. That is absolutely shocking. You think about it long enough and you won't sleep.
>
> I sometimes wonder, are lawyers supposed to be lawyers? Are judges supposed to be judges or are the lawyers and the judges supposed to be rabbits, robots, whichever way you want to say it? . . .
>
> I would be ashamed of myself and any other lawyer for that matter who couldn't face a judge and say on behalf of his client, "This policeman lied and you can't use those lies to—as a vehicle for hurting this defendant."
>
> It is impossible of comprehension in modern times. It would be impossible of comprehension at any time in the history of the world to destroy one man based upon the lie of another. The good Lord made most of us with conscience. We are not donkeys. We don't believe everything we hear if we know it is wrong, and when we know it is wrong, then we have responsibility; we do something about correcting the wrong.
>
> The way to correct this wrong is to suppress the evidence in this case. . . .
> Tr. 10/23/70: 82a–88a.

5. Before this Court, the State apparently contends it is not bound by these concessions. (Tr. 8/27/74: 81) The Court has grave doubts whether the State can here withdraw such a concession, made before the state judge who heard the evidence and found the facts, but does not reach that issue. There is no doubt that those concessions were made to the state judge, and are therefore a part of the state record against which this Court must determine whether the state judge's findings are fairly supported.

*stricted to the insufficiency of the affidavit on its face and will not go beyond that.* So at this point I permitted questions to see what they were going to lead to. If you are going to this area I will sustain the objection.

MR. QUERQUES: Well, your Honor please, I think that what we are going to get into another issue and the issue—the other issue is one of whether or not this is a proper situation for calling upon the State to name the informer and produce the informer or face the possibility of dismissing this matter. I think respectfully that we have shown enough and I am trying to lay the foundation by just another few questions for the delivery of the informer in this particular case by reason of what we have shown already. I might indicate to you that—

THE COURT: Do you want me to rule on it now, if that is your argument at this point, I will rule that you have not shown enough to justify the production of the informer and he will not be produced.

MR. QUERQUES: Well, I wanted to ask these questions, did the informer get paid? Did the informer get any other type of consideration? And I want to ask the ultimate question of who is the informer?

THE COURT: Well, they are your questions and that is your offer of proof, denied.

MR. QUERQUES: That is all I have, your Honor.

(Tr. 7/17/70: 68a–69a) (Emphasis added)

The court reserved decision until November 13, 1970, when it denied the motion to suppress. The court found, in spite of the State's concession that Gauthier had *not* made the calls and heard the bets placed, that Gauthier *had* in fact made the calls and heard the bets placed. Moreover, in rejecting the State's factual concessions, the state judge explicitly adopted the State's legal argument that the veracity of Gauthier's averments was beyond challenge:

> During the course of the argument on the motion, it was suggested that the affiant, Lt. Gauthier, had submitted perjurious testimony to the issuing Judge for the purpose of obtaining the search warrant. This issue was so argued that at points during the argument I became confused as to whether or not I was hearing a motion to suppress evidence as to the defendant Petillo or whether it was a summation on a charge of perjury against the State Policeman.

> After reading the affidavits and particularly after hearing the testimony of the police officer who testified before me as a defendant's witness, *I not only disagree with the argument as to his testimony but I feel it dehors the basic grounds to be considered on the motion.*

(Tr. 11/13/70: 100a) (Emphasis added)

Thus, although the state court apparently went on to find that Lt. Gauthier did not submit perjurious testimony to the issuing judge, it did so after it had already determined as a matter of law that the question whether Lt. Gauthier perjured himself was beyond the scope of the motion to suppress.

The state court's ruling in the instant case was based first on the legal conclusion that there was no right to demonstrate that the policeman had perjured himself, because such a demonstration was immaterial. The ruling was premised secondly on two alternative factual findings: first, that Gauthier's affidavit was accurate, and second, that even if the disputed calls were excised from the affidavit and disregarded, the remainder of the affidavit was accurate. The court then reached its ultimate legal conclusion that the remainder of the affidavit, the accuracy of which had not been challenged directly, was sufficient standing alone to establish probable cause.

■ Those factual and legal conclusions cannot survive the instant federal constitutional attack. The claim of police perjury was not "dehors" the issue; it was the issue. To disregard it was constitutional error. If the court had found inaccurate Lt. Gauthier's affidavit and testimony regarding the calls, the next inquiry would have been to determine whether the inaccuracies were deliberate or innocent, the product of an intent to deceive or of mere negligence or mistake with regard to the number dialed, the date it was dialed or other relevant particulars.

If the error were found innocent, the alternative would then have been open to the trier to consider the legal question whether merely innocent error in police affidavits is lethal, or whether more must be shown before the inaccurate averments must be discarded and recourse had only to the remainder. It is only once these issues had been resolved that the court could properly have moved on to the credibility of the remainder, and if it were found credible, to its legal sufficiency. The decision on the credibility of the remainder would itself turn on the accuracy, and the *honesty,* of the challenged portion.

■ But that is not what happened here. The state court found that the testimony and the affidavit were accurate with regard to the calls by the policeman. That finding is not fairly supported by the record, within the meaning of *Townsend v. Sain,* 372 U.S. 293, 313, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963), *cf.* Title 28 U.S.C. § 2254(d)(8), since it must necessarily have been predicated on the state judge's erroneous characterization of the Waski testimony. Only that characterization could have explained the apparent inconsistency between Gauthier's version of the facts and the facts revealed by the telephone company records and conceded by the State.[6]

---

**6.** In summarizing Mrs. Waski's testimony, the court noted that "the thrust of this testimony was that the telephone number recited in the affidavit could not have been in existence at the time on the dates set forth in the affidavit when the phone calls placing the bets were allegedly made." (Tr. 11/13/70: 98a) The court nevertheless found that Lt. Gauthier did in fact hear the two bets being placed by the informant, after 429–9377 was dialed on each occasion by the Lieutenant (Tr. 11/13/70: 100a), and that the testimony of Mrs. Waski was not completely conclusive on the issue of whether the telephone at Petillo's home could have rung when that number was dialed as Lt. Gauthier had claimed by affidavit and testimony. (Tr. 11/13/70: 100a–101a).

The apparent basis for this conclusion was the state judge's finding that, when he asked Mrs. Waski "whether or not it was possible that through some technical irregularity the phone *could* have rung [sic] at the defendant's home and although she said that she was not qualified as a technician in this respect, her answer was that it was *probable.*" (Tr. 11/13/70: 98a) (Emphasis added) The actual colloquy at the hearing does not support that finding:

THE COURT: I was going to ask another question. Isn't it possible even after that 429–9377 became according to your records—these are the records of your office—even though that showed that it was inactive after December 8th date, isn't it possible that there is a way of circumventing the intercepter?

THE WITNESS: I have heard of people, you know, putting equipment on lines of their own. Read that in the paper. I don't know how.

THE COURT: It is possible?

THE WITNESS: *Anything is possible. But I wouldn't know how they would do it.*

(Tr. 7/17/70: 49a) (Emphasis added)

The State has conceded before this Court that the state judge's finding that "it was probable" that the telephone could have rung at the Petillo home when the disconnected number was dialed is not supported by the record:

THE COURT: That finding is not supported by the record, is it?

MR. COHEN: No. Had he said possible, it would have been but he said "probable." I agree that is not what the testimony is.

THE COURT: Please confront the opinion as it is. We have dealt with a lot of possibilities to explain what the policeman might have meant. Now we are dealing with the judge's opinion.

*Is that finding supported by the record?*

MR. COHEN: *No, sir.*

Under these circumstances, the alternative finding of the credibility of the remainder of the affidavit (and of its legal sufficiency), even disregarding the two disputed calls, is also not fairly supported by the record. If in fact the two calls were made, as the court found, there was no need to disregard them. If in fact they were not made, as the State conceded, it was improper to disregard them. Once a finding of inaccuracy was made, a full and fair hearing would have required a court to pass upon the reason for the inaccuracy, before crediting anything else in the policeman's affidavit. The credibility of the remainder would have had to have been appraised, and that appraisal would necessarily have turned on the reason for the rejection of the challenged portion. The "unchallenged" averments could not properly have been judged as though no suspicion had fallen upon the affiant.

 When a defendant introduces substantial evidence from an authoritative and independent source which directly contradicts some of the material allegations of the affidavit, the trier must face and resolve the dispute. Rarely, if ever, can the subject of a search controvert every averment in an affidavit. No matter how fictitious or numerous the misstatements, all that the defendant may be able to show is that some of them were deliberate falsehoods. He may then appropriately seek to attack the credibility of the remainder of the affidavit on the basis of those falsehoods he has been able to demonstrate. Mere excision of the challenged portion without determining the validity of the challenge, however, deprives the defendant of a full, fair and adequate hearing by disregarding the evidence in his favor and focusing only on that which he has been unable to challenge directly.[7] Moreover, it is also clear that due process required that the informant be produced, in order for any fair determination to be made on the question whether the lieutenant lied in his affidavit.

On this record the informant had to be produced in order for the court to determine Gauthier's credibility fairly, and until the issue of Gauthier's credibility was faced and resolved, no part of the affidavit could fairly be relied upon. To the extent that disclosure of the informant's identity was denied under these circumstances the hearing did not meet the standards of the Due Process Clause.[8]

---

THE COURT: *As a matter of fact, it is quite the obverse of what she testified to, isn't it?*

MR. COHEN: *Yes. If the obverse—it would be fair to characterize her testimony that it was improbable, yes.*

(Tr. 8/27/74: 99) (Emphasis added)
The "probable" finding was critical to the state judge's ultimate factual finding that Lt. Gauthier's affidavit and testimony were to be credited. In disregarding the State's concession that the telephone had not rung and that the officer had not heard what he claimed to have heard, in favor of the lieutenant's account, the state judge necessarily found that despite the telephone company records produced and used by Mrs. Waski in testifying that the telephone could not have rung, she had nonetheless testified that it was "probable" that the telephone could have rung, just as the officer claimed.

7. Even assuming the state court was correct in its ruling that the warrant could be sustained by looking only to the unchallenged averments to determine whether the affidavit was sufficient to support probable cause, there is simply nothing left in that affidavit to support probable cause once the challenged statements are excised. There is no independent corroboration of the informant's information, except the trooper's account of his surveillance of certain persons entering petitioner's premises "during the critical hours of late in the morning until early in the afternoon," which the court found "in the trade are the hours just before post time," with brown paper bags, which the court found "are a badge of the trade," and with red-bordered newspapers, concerning which the court ruled, "I can take notice of the fact that the scratch sheets or some scratch sheets bear red borders." (Tr. 11/13/70: 101a–102a) *Cf. Spinelli v. United States*, 393 U.S. 410, 89 S.Ct. 584, 21 L. Ed.2d 637 (1969).

8. In Petillo's case, the disclosure of the identity of the informant was necessary for the hearing to be full and fair, as required by the Due Process Clause. *McCray v. Illinois*, 386 U.S. 300, 87 S.Ct. 1056, 18 L.Ed.2d 62

Another point merits attention here. In accepting the State's contention that police perjury may not be attacked in a motion to suppress before trial, the state judge apparently relied on the prosecutor's assurance that if the motion to suppress were denied the jury would hear the testimony impeaching Gauthier's credibility at trial:

> MR. SOLLER: . . . I think Mr. Querques has pointed out some salient features in this case. However, most of them should be going before a jury rather than before your Honor in deciding this case.

It is clear that Mr. Querques pointed out various factors that should be considered by a jury in this particular case and they are indeed questions of fact . . . .

(Tr. 10/23/70: 89a)

The prosecutor further suggested that at a subsequent trial, impeachment of Lt. Gauthier by the testimony of Mrs. Waski and by cross-examination of Lt. Gauthier based on the statements in his affidavit, was certain to be available to the defense:

> MR. SOLLER: . . . Your Honor, each of the other allegations in this affidavit must stand. They have not been disputed. Mr. Querques merely disputed the fact that telephone calls were made on a certain date and as your Honor charges the jury, and I am well aware of this as

---

(1967), and *Roviaro v. United States*, 353 U.S. 53, 77 S.Ct. 623, 1 L.Ed.2d 639 (1957), are not to the contrary.

Although it is clear that the identity of an informer need not be disclosed upon application for a warrant, there does come a point where "the Government's privilege to withhold from disclosure the identity of persons who furnish information of violations of law to officers charged with enforcement of that law," *Roviaro v. United States, supra,* at 59, 77 S.Ct. at 627, must give way. In the context of its supervisory power over the conduct of federal criminal trials, the Supreme Court has identified that point as "[w]here the disclosure of an inform[ants] identity, or of the contents of his communication, is relevant and helpful to the defense of an accused, or is essential to a fair determination of a cause." *Roviaro v. United States, supra,* at 60–61, 77 S.Ct. at 628. *Cf. United States v. Jones,* 492 F.2d 239 (3rd Cir. 1974); *United States v. Davis,* 461 F.2d 1026 (3rd Cir. 1972).

In *McCray* the Court considered the applicability of *Roviaro* to state proceedings. The Court refused to "impose any absolute rule requiring disclosure of an informer's identity," either in federal trials or in state pretrial proceedings. However, the Court noted:

> The arresting officers in this case testified, in open court, fully and in precise detail as to what the informer told them and as to why they had reason to believe his information was trustworthy. *Each officer was under oath. Each was subjected to searching cross-examination. The judge was obviously satisfied that each was telling the truth,* and for that reason he ex-

ercised the discretion conferred upon him by the established law of Illinois to respect the informer's privilege.

> *Nothing in the Due Process Clause of the Fourteenth Amendment requires a state court judge in every such hearing to assume the arresting officers are committing perjury.* "To take such a step would be quite beyond the pale of this Court's proper function in our federal system. It would be a wholly unjustifiable encroachment by this Court upon the constitutional power of States to promulgate their own rules of evidence . . . in their own state courts . . . ." *Spencer v. Texas,* 385 U.S. 554, 568–569 [87 S.Ct. 648, 656, 17 L.Ed.2d 606].

386 U.S. at 313, 87 S.Ct. at 1063 (Emphasis added)

*McCray* is thus distinguishable from the case at bar. To hold that the Due Process Clause does not require the state judge to assume that perjury is being committed in *every* hearing is certainly not to say that the Clause tolerates a rule which, under the circumstances of this case, prohibits any adversary hearing or inquiry at all. Once a prima facie showing of material misrepresentation has been made, as here, the credibility of the officers is indeed "essential to the fair determination" of the cause. *Roviaro, supra,* 353 U.S. at 61, 77 S.Ct. 623; *Cf. Rugendorf v. United States,* 376 U.S. 528, 532–533, 84 S.Ct. 825, 11 L.Ed.2d 887 (1964); *Jones v. United States,* 362 U.S. 257, 271, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960). In the instant case, the showing made by Petillo and the concessions made by the State required the production of the informer.

Mr. Querques, if they find that a party or a witness lies to a material fact, they believe some of it, none of it or all of the rest of his testimony, and this is a question for the jury. We are merely deciding here whether or not the remaining information in the affidavit supplies enough probable cause for Judge Joelson to have granted the warrant.

Now in order for us to accept Mr. Querques' position that all of the remaining information was false, we would have to go through a complete investigation of everything that is alleged here *and that is not for us to do. That is for the trial of the case and I am sure if this case comes to trial, this will be brought out and it will be for the jury to decide whether or not this one fact, which I do not dispute at all, is a crucial issue. What is false?*

(Tr. 10/23/70: 91a–92a) (Emphasis added)

At trial, however, the prosecutor's confident prognostication was not borne out. A different prosecutor objected to the use of the affidavit to impeach the Gauthier testimony, and his objection— that the evidence was proper for a motion to suppress but not for trial—was sustained by yet a different judge who was apparently unfamiliar with the prior proceeding on the motion to suppress, and the prior concessions and predictions of the original assistant prosecutor.[9]

9. THE COURT: All right, I'll hear you, Mr. Weissbard. You indicated that there was something you wanted to discuss with the court.

MR. WEISSBARD: Yes, your Honor. There are two really separate matters based upon which I intend, subject to whatever the Court is going to rule, to open up a matter that would ordinarily be probably foreclosed from the prosecution going into. . . .

THE COURT: Would you be more specific, please?

MR. WEISSBARD: Surely. The officer's affidavit states that he got information from an informant. And I'm willing to have him say that he got it from an informant, that horse bets were being taken by someone on a certain telephone, that the man gave the address and gave the telephone number, and that telephone number the officer says was checked out to this defendant at that address.

THE COURT: By whom?

MR. WEISSBARD: Well, that is a little open question in there. It merely says in the affidavit, an examination of the records revealed on the motion to suppress, I believe the upshot was that he conceded he did not check it, that someone else in the office checked it and he relayed it back to him. But the matter is, with that information by whoever it was obtained, he then met the informant and the dates in question are March 4 and 5. He met the informant at a pay phone somewhere and the officer dialed the telephone number, the one that had been obtained which was the one that his informant had given him. And the officer waited until the phone was answered and he heard someone say hello or something and then he handed the phone to the informant who then placed a horse bet with the person on the other end. That is what it says in the affidavit. The officer elaborated somewhat on that. I imagine he would go along with it here that he listened in by cupped [sic] his ear to the phone. I guess they held the phone a little sideways and he was able to hear. And they heard the conversation that there was some conversation on the other end of the bet. They then hung up and another day March 5, they did the same thing. Now we are prepared to prove through telephone company records that on the date in question that number not only was not listed to the defendant, I'll just go back a step. He had had that phone number for about two weeks some three and a half months earlier, but only for a period of about two weeks. But on the date in question, which is three months after it had been taken out, he did not have it and indeed nobody had that number. It had not been assigned again by the telephone company. This is consistent with their practice, apparently not to reassign numbers right away. And if someone had called that number, all they would have gotten was what they call an intercept operator, which either would have been a recording or a female voice saying, you have the wrong number, what number are you calling, if they had gotten anybody. This is because of the way it is hooked in in the phone company.

This number changing business is not something that could be circumvented in

the individual's home, because these changes are made in the central office. When the number is changed, the phone work is done in the central office, so it is not something that could be circumvented by fiddling in the house with the telephones. There was an auxiliary number at this address, which the informant didn't mention that. But when they checked the phone company records, they came up with a number that such and such is an auxiliary phone number at that address. That number was wrong to begin with. They had the wrong exchange on that, although the last part was correct, but the telephone company representative will state that by dialing the main number. The one that was disconnected does not switch you over to the auxiliary, so that the phone would be connected to that residence in any event. So basically, we can show that.

\* \* \* \* \*

Tr. 2/17/71: 33–39.

I want to go into the whole thing. I think, of course, the credibility question on the phone would bear on whether the officer can be believed when he says that the man that he saw whose description does not fit the defendant, is in fact the defendant as he says it is. And these are matters that I think I am entitled to argue to the jury about. They arise in this case, acknowledging that normally the prosecution might not be able to go into it, though I think there is authority for them going into prior surveillance. Although many times, I know they stay away from it. I think they could not or will not go into the informant or that business, but I'm willing to open that door to accomplish what it is that I have stated.

THE COURT: Mr. Petrolle?

MR. PETROLLE: Your Honor, I think it has been fairly clear that the State has limited its proofs to the day in question.

\* \* \* \* \*

Id. at 41.

Also, sir with respect to the question as to phone numbers, the State does not seek to prove here that this phone number set forth in the affidavit or any other phone number for that matter was the particular phone over which bets were being received on the day in question, March 20, 1970. To suggest that, at this time, that the defense can proceed on the State's case to bring out testimony beyond the scope of a direction [sic] examination of a witness and then in its own case seek to impeach the credibility of this witness with respect to testimony which it has sought to bring out beyond the scope of the State's direct examination of a witness, I think is disstretch, at least disstretch [sic] the discretion of this Court in terms of what should be proper examination during the State's case. Now if there is any time at which such an examination could take place, if it should take place at all, perhaps would be on the defense case. But even then, I submit that it raises issues here collateral to the main issue and not directly or related in any relevant manner, due to the fact, here we talk about a particular day, a particular crime having occurred on that day. We talk about bets being received over a phone in the house on March 20. But then the defense seeks to expand the examination to other dates in which phone calls were made to draw the State's case out to a position where it feels that by reason of *evidence which would normally be for the consideration at another hearing, a motion to suppress,* and evidence which the State has chosen not to make a part of its substantive case here, to draw the witness into that area and then on its own case, after drawing the case into area, to rebut the testimony which it has sought to bring out here. It seems to me that that goes beyond the purpose of a trial and beyond the limits of a trial. Thank you.

THE COURT: I would pick up where the Prosecutor just left off. I suppose from what you have told me, Mr. Weissbard, that it is your purpose, if permitted, to cross examine this witness with respect to his activities on prior occasions.

MR. WEISSBARD: Right, that is so.

. . . .

THE COURT: I take it there was a motion to suppress in this case.

MR. WEISSBARD: Yes, sir.

THE COURT: And you are here, I'm sure, because the motion was denied.

MR. WEISSBARD: I think so.

\* \* \* \* \*

Id. at 45–51. (Emphasis added)

. . . .

THE COURT: I have before me *State vs. Mondrousch* in 108 Super, page 1, certification denied in 55 New Jersey, I think it was at 600. In that case the defendant was found guilty of attempted breaking and entering with intent to steal and possession of burglary tools. He was a police officer. The primary prosecution witness was another police officer Clements. And the defendant attempted to elicit from another officer, several of Clements' past actions that would indicate that he had previously, falsely accused certain persons of committing criminal acts. And the defendant argued that that evidence was both an attack on Clements' credibility and an attempt to establish a pattern

The jury never heard any testimony with regard to the misstatements of Lt. Gauthier in the prior judicial proceeding before the issuing judge, as exposed at the suppression hearing. In light of the disposition of this petition on other grounds, this Court does not now reach the question whether the exclusion of this testimony deprived petitioner of due process of law and of a fair trial with the right to confront his accusers, with-

in the meaning of the Fifth, Sixth and Fourteenth Amendments.[10]

### B. ALBANESE

Petitioner Albanese alleges that he did not receive a full and fair hearing in the state court, and that he was denied due process of law there, because "the Trial Judge refused to suppress evidence illegally obtained from Petitioner by a search warrant which was based on a

---

of habit of custom and was admissible. Judge Goldman writing for the Appellate Division said this: Evidence Rule 20 dealing with evidence generally affecting credibility, permits the introduction of evidence to impeach a witness, however, this general rule is explicitly limited by Evidence Rules 22 and 47. 22 provides that as affecting the credibility of a witness, evidence of traits of his character, other than honesty or veracity or their opposites, shall be inadmissible. Evidence of specific instances of his conduct, relative as intending to prove a trait of his character shall be inadmissible. Those are subdivisions C and D of the Rule. It is my understand [sic] that questions dealing with traits of character, other than honesty or veracity or their opposites, deal with a reputation, such as the reputation that we are familiar with, when offered by a defendant in a criminal case. To go on with what Judge Goldman said: And Evidence Rule 47 permits proof of a trait of character, which is essentially what you want to establish here.

. . . .

Defense Counsel's attempted line of questioning clearly ran counterace to the Rules just cited. [sic] The Trial Judge quite properly ruled inadmissible to specific instances by Clements as affecting his credibility. Now I fail to see a distinction between an attack on credibility through a specific instance in a case in a matter unrelated to the case at Bar. And one which is peripherally related in the sense that here the contention is that the Officer said in an affidavit that he had dialed a telephone number, which you tell me was not in operation on the days which he said he did the dialing. Those dates were on, I think the 4th and 5th of March, some two weeks earlier. I therefore hold that by virtue of Mondrousch, that a specific instance has not been shown, since as I read the case, since it

prohibited by the rules which were cited by Judge Goldman in his decision.

. . . .

*Id.* at 59–63. *But see Johnson v. Brewer,* 521 F.2d 556 (8th Cir. 1975).

10. This Court had the following colloquy with the Assistant Prosecutor:

THE COURT: . . . In other words, Mr. Cohen, the Prosecutor told the judge, Judge Hayden, he had no doubt that all of this would be brought out before the jury. But later on, apparently a different prosecutor, different judge, the defendant was prevented from bringing all this out to the jury. That is a fair statement isn't it?

MR. COHEN: Yes, that's correct.

THE COURT: Does that trouble you at all?

MR. COHEN: Sure, it troubles me. It troubles me in the same way it troubles you.

THE COURT: Is the end goal the conviction of guilty bookmaker so all-fired important that the State would endorse a prosecutor telling a judge he has no doubt that the information in the affidavit was false and then the State telling an appellate court later that the information was true; that the State should tell the trial judge that all of the information will be brought out before the jury and that later at the trial the State should object when an attempt is made to do that?

Is that due process, to begin with? Is it fundamental fairness? Is it something —and does the end result of convicting a guilty bookmaker really either justify or require that kind of thing?

MR. COHEN: I do not think so, Judge. I think that if anything that entire scenario that you just painted with respect to what happened at the trial after what happened at the motion was probably done completely unwittingly. Obviously—

THE COURT: It wasn't unwittingly by the time the case was on appeal. . . .

Tr. 8/27/74: 79–80.

false affidavit as admitted to by the Police Officer who executed the affidavit, at the time of trial." (Petition, at 2)

The state court record reveals that petitioner Albanese sought leave to file a motion to suppress evidence out of time on April 17, 1972. The motion was predicated on alleged misstatements in the affidavit of Detective Anthony Nicosia of the Newark Police Department, which was the basis of a search warrant issued on May 3, 1971 by a judge of the Municipal Court in Newark. Pursuant to the warrant, Albanese was stopped, his person, automobile and residence at 148 Clifford Street, Newark, searched, and certain items seized. The same Essex County Court judge who presided in *Petillo* heard argument on April 17, 1972, and denied the motion on May 1, 1972. Petitioner Albanese's first trial had ended in a mistrial, declared when the jury was unable to agree on a verdict, and petitioner's new counsel, Angelo R. Bianchi, Esquire, told the court at the April 17, 1972 argument that although original counsel had not filed a motion to suppress, "after reading the transcript [of the first trial] which was supplied to me on Wednesday of last week, I have come to the conclusion that a motion to suppress in light of the testimony that came out at that trial is appropriate, despite the fact that the 30-day period of time has elapsed." (Tr. 4/17/72: 2–3) The motion was premised on Nicosia's testimony at the first trial, in which he admitted that certain of the statements in his affidavit were untrue. (Tr. 3/7/72: 56) Specifically, Nicosia admitted that the following portion of his affidavit was not wholly accurate:

Surveillance was set up on the premises of 148 Clifford Street, between various hours starting at 7:30 A.M. and ending at 6:00 P.M., on April 1, 2, 3, 13, 20, 21, 22, 23, 24, 26, 27, 28, 29, 1971. On April 13, 1971 to and including April 29, 1971 I did see a white male, 49 to 55 years of age, 5'6" to 5'8" tall, dark hair, 240 lbs. leave the premises daily between 12:45 P.M. and 1:10 P.M., and enter a 1969 white Oldsmobile, registration PSO 492 N.J. which is parked in the driveway of this address. Subject would then drive to the area of Wheeler Point Rd., Elm Rd. and Chestnut Street, remain in this area from 10 to 20 minutes, during this period of time, unknown white males and on one occasion a colored male, would approach the subject when he was in his auto or on the sidewalk, short conversations were held and at times I saw money passed. Subject would then go to a public phone using same, when call was completed he would then drive to 264 Ferry Street, The Foursome Bar, where he would park, then enter the tavern, remain there for five to ten minutes then leave. On other occasions an unknown male would come out of the tavern, enter the subject's auto, hold a short conversation, then leave the auto. On one occasion subject was seen counting money which he received from an unknown white male. Subject would then drive to the intersection of Herman Street and Pennington Street where an unknown white male would be waiting for him, approach the auto on the driver's side, hand him something, hold a short conversation then leave. Subject would then drive off to other locations where the same actions were repeated.

Nicosia admitted on cross-examination at the first trial that the last sentence of the paragraph which alleged that Albanese repeated the same conduct at other locations was not true. Nicosia testified that he did not know, either when the affidavit was signed or at the time of trial, where petitioner Albanese went after he left the Foursome Bar, except for one occasion when Albanese was observed counting money received from a white male. (Tr. 3/7/72: 54–56) Cross-examination also elicited Nicosia's admission that despite the phrase "on April 13, 1971, to and including April 29, 1971 I did see a white male . . . leave the premises daily . . .,"

and despite the consistent use of the construction "would drive" and "would go" in the excerpted paragraph, the detective had only followed Albanese to the tavern on three occasions, and had only seen Albanese receive money from the white male on one occasion. (Tr. 3/7/72: 53–54) However, Nicosia maintained that he had followed Albanese "to the area of Wheeler Point Rd., Elm Rd. and Chestnut Street" on all ten occasions when he claimed to have had Albanese under surveillance.

Mr. Bianchi made the following argument to the state court in support of his motion for leave to file a motion to suppress out of time:

> MR. BIANCHI: I would say this, most respectfully, that if we knock out those ten occasions, we knock out the alleged pattern as set forth here. We do not have a man going into a restaurant on ten dates, staying in the restaurant ten to twenty minutes and leaving the restaurant, and three days going into a tavern and on one occasion speaking to somebody in a car. You look at the totality when we look at this affidavit. We look to see if there is a scheme, or a pattern that was followed . . . . This shows a pattern. But when you knock this out, then we do not have a pattern . . . .

(Tr. 4/17/72: 9)

The court reserved decision on the motion for leave to file the motion to suppress, and heard further argument on May 1, 1975. Citing the discrepancies between the affidavit and Nicosia's testimony at the first trial, Mr. Bianchi made the following argument:

> I respectfully submit that based upon that we have this affidavit completely denuded. We have the effect of this affidavit, I would submit if your Honor please, in such a position that your Honor should consider whether or not there was sufficient probable cause for the Magistrate under the circumstances to issue a warrant. Because when you read the affidavit, and since

he admitted the inconsistencies and incorrect statements, and untrue statements, all you have most respectfully is a man being seen leaving a house, going to a restaurant, going to a bar and on one occasion someone handed him what appeared to be money in front of the bar. Now it does not set forth that scheme, that continuity that we would have I assume that the Magistrate used in coming to his conclusion. But this was a pattern that was followed daily. We do not have it when we look at that.

\* \* \* \* \* \*

I submit that the facts and circumstances in this case, and I most respectfully move if your Honor please, permit the defendant to apply for a motion to suppress and for your Honor to hear further argument concerning same.

(Tr. 5/1/72: 4–5)

The State contended in response that Albanese's two prior counsel had been fully competent, and had failed to file motions to suppress within the prescribed 30-day period from the entry of the not guilty plea. The State further argued that even if the motion were permitted to be filed, it should be denied on the grounds that, based upon "what was in front of" the magistrate, probable cause existed for the issuance of the warrant, and that the issue of the truth or falsity of the statements in the Nicosia affidavit was without legal significance. The state characterized that issue as "a question of credibility, a question of fact," to be argued to the jury at trial. (Tr. 5/1/72: 6–10) The court then ruled:

> THE COURT: It is obvious neither one of you have read *State v. Kasabucki*. This was disposed of by the Supreme Court in the Kasabucki case. Number one, you have information given by an informant. It was alleged that some of the information was false. So it went to the Appellate Division. The Appellate Division reversed the trial court. And refusing

to grant the motion they went to the Supreme Court. And on a very learned opinion by the Chief Justice I thought he set out the rules very clearly. When there is a search warrant issued on an affidavit, even though some of the information in the affidavit may be inconsistent or false, in essence, he held that where there is sufficient probable cause in the affidavit to justify the issuance of the warrant, the warrant should not be vacated. That is what I find in this case.

I heard the testimony and I read the affidavit and re-read it. I am aware that Nicosia at the trial testified, to use the language as I recall it, *and even admitted that he lied in the affidavit with respect to some subsequent surveillances,* and they were in the area of Herman Street. But taking the affidavit as a whole and reading it in its entirety, *I find that even if you discount the information in the affidavit that may or may not be false, and even accepting that it is false, there is sufficient in the affidavit to justify the issuance of the warrant.*

Going back to the original issuance, the Municipal Court Judge, Judge Hazelwood, even if he had before him that same information and the allegations which developed in the trial were false, I am holding that there is sufficient in the affidavit before him —not before me—before him at the time that he issued the warrant, there is sufficient in the affidavit to hold that the warrant is a proper warrant.

MR. BIANCHI: Your Honor, May I just get something clear in my mind. Has your Honor denied my application to argue the motion or has your Honor granted us that and denied the motion to suppress?

THE COURT: Both of them I have denied, your motion and to argue the motion. So that is dispositive of the motion to suppress.

Send for a jury.

(Tr. 5/1/72: 11–13) (Emphasis added)

The Court thus duplicated its ruling in *Petillo,* except that here it was apparently willing to assume, without any evidentiary hearing, that the policeman may have lied. Just as in *Petillo,* however, it then excised and totally disregarded the challenged material. The court looked only to the remainder and found it legally sufficient to establish probable cause, without permitting its credibility to be challenged at an adversary hearing.

It is therefore clear that Albanese was never afforded an adversary hearing. After the court's ruling he was immediately tried, and subsequently convicted. Nicosia testified at the second trial, and Mr. Bianchi was permitted to cross-examine on the inconsistencies between his statements in the affidavit and his testimony on direct examination. (Tr. 5/2/72: 2.2–2.58; 2.118–2/130; 2/135–2.137) When confronted with the statements in the affidavit, and with his testimony at the first trial, Nicosia repudiated his prior testimony and maintained with a lengthy explanation that the statements in his affidavit had been true, though "inarticulately drawn." [11]

11. Q: Right after you referred to inarticulately the reference to Herman Street you then say, "Subject then drove to the other locations where the same acts were repeated." What about that?
A: Yes sir, I did.
Q: But that is not true?
A: It is true, sir.
Q: It is true.
A: Yes, sir.
Q: You said you made no observations of him?

A: You see, the complete surveillance on this particular case, I picked only several items or factors in my opinion that were criminal and put them into my affidavit. Now, after following the defendant to the places that I specified I was losing him, and I lost him in the traffic on many occasions. After losing him in the traffic, Mr. Bianchi, I would search for him and would find him at other locations. The independent recollection that I have of finding him at another or other locations

was once on Elizabeth Avenue, where I found a man leaving his car. Upon this fellow alighting from this car he took off. I was unable to follow him on another occasion. As a matter of fact, on two occasions I found the defendant in the area of Adams and Chestnut Street. There were other places, but I am not familiar with the Down Neck area and I did not know the streets. For me to continue on, it would be a constant repetition where I was not close enough to see any kind of a transaction that was taking place. So, in my opinion, this is what I meant by that last statement that I have here where he would go to other locations.

Q: Let me ask you this: You say you did not put it in because it was of no significance and you did not see anything wrong there; is that right?

A: That is true.

 * * * * *

Q: What do you mean by, when you put in there, "Where the same actions were repeated," if it was nothing wrong?

A: Well, by his actions I meant he would park his car in the vicinity of a certain area and remain in that area anywhere from, I would not know whether it is five minutes or fifteen minutes, but he was there. When I would turn my car around to get in the position to try to follow him, Mr. Albanese would be gone.

Tr. 5/2/72: 2.19–2.21; 2.26–2.27 (*Cf.* 2.-118–2.119)

Nicosia further testified that the phrase "on other occasions an unknown male would come out of the tavern . . ." in his affidavit was a typographical error, and that it should have read "on another occasion." (Tr. 5/2/72: 2.42–2.43)

On redirect examination, counsel for the State questioned Nicosia about the phrase in the affidavit, "Subject would then drive over to other locations where same actions were repeated":

Q: Why did you put that sentence in there?

A: In my opinion, this is what he did and this is what he was doing. I was finding him at these other locations. This is what made me put this statement in my affidavit.

Q: What was that based upon? Was there a pattern?

A: It was based on eight years' experience that I have had in the special gambling squad.

MR. BIANCHI: I object, your Honor?

THE COURT: I will allow it.

Q: Did you attempt when you made that affidavit to deceive anyone?

A: No, sir.

Tr. 5/2/72: 2.142–2.143.

On recross, Mr. Bianchi and Nicosia had the following colloquy:

Q: You put into that affidavit and presented to a magistrate the facts that you guessed at and you never say; is that correct?

A: No, sir.

Q: It isn't? What is it?

A: As I stated, from the actions that I did see and his car at the various locations, and on the occasions that I did see him, in my opinion of eight years in the special gambling squad I felt this was enough probable cause that he was still engrossed in his so-called activity.

Q: You guessed that he was doing that? You guessed that when he went to the other locations that he was doing that despite the fact you did not see him do it? Am I correct?

A: This is my opinion, sir.

Tr. 5/2/72: 2.156.

Later in recross, Mr. Bianchi elicited the following testimony:

Q: Do you recall on one occasion you saw a man get out of his car and at another time you saw him in a previous conversation? Then someone left. You concluded and put in your affidavit that what you saw on those occasions were the same actions as above?

A: Yes, sir.

Q: And those actions were people handing him money?

A: As I indicated, an object was handed to him which I could not identify.

Q: But on the two occasions on Elizabeth Avenue and Adams Street you did not see money or an object?

A: No, sir.

Q: But you put it in there to indicate that money or an object had been handed to him on those other occasions; am I correct?

A: This was my own opinion, sir.

Q: Despite the fact that you did not see him?

A: That is true.

Q: You guessed at it; didn't you?

A: This was my opinion, sir.

Q: It was not based on anything you saw? You did not see anybody handing money on Elizabeth Avenue or Elm Street. You did not see anybody handing him an object that you could not identify on Elizabeth Avenue or Elm Street; could you?

A: That is true.

Q: You guessed that?

A: Yes, sir, encompassing everything; yes, sir.

## III. *LEGAL ANALYSIS*

The Fourth Amendment to the United States Constitution provides:

> The right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

On appeal in *Petillo,* the Supreme Court of New Jersey wrote:

> As this Court said in *State v. Burnett,* 42 N.J. 377, 388, 201 A.2d 39 (1964), with the subsequent express approval of the United States Supreme Court in *McCray v. Illinois,* 386 U.S. 300, 306–308, 87 S.Ct. 1056, 18 L.Ed.2d 62, 68–69, reh. den. 386 U.S. 1042, 87 S.Ct. 1474, 18 L.Ed.2d 616 (1967), the Constitutions are satisfied if a judicial mind decides that the sworn factual allegations set out in the affidavit or testimony sworn to before him show the required probable cause. When such proof is presented the judge is trusted to evaluate the legal sufficiency of the sworn facts to support such a determination, and the credibility of the affiant in asserting them. Undoubtedly, if the judge has any doubts or suspicion on the matter of credibility, he may require additional proof or subject the affiant to further examination. But if he is satisfied on both scores, and the facts do make a sufficient showing of probable cause, then the legal propriety of the issuance of the warrant ought to be beyond further question.

The standard provided in the Constitutions as the basis for intrusion into the home of a citizen because of alleged gambling activities is not proof of his guilt of the criminal offense. The requirement is sworn statements of fact of sufficient legal quality to persuade an impartial judge that probable cause exists to believe that the crime described is being committed at the place. Once that test is met to the satisfaction of the judge, relitigation of the truth of the factual basis for *issuance* of the warrant should not be permitted. The ultimate truth of the criminal charge against the accused is not involved on a suppression motion. On the contrary his effort is to avoid the evidence of that truth which provides corroboration of the basic truthfulness of the affidavit. *State v. Burnett, supra,* 42 N.J. at 386, 201 A.2d 39, and *Cf. People v. Mack,* 12 Ill.2d 151, 145 N.E.2d 609, 615–616 (1957).

In our view the constitutional safeguards are met when the impartial judge finds the affidavit for the war-

Q: After you guessed at it you put it in this affidavit and presented it to a magistrate. You then said that he would drive over to other locations where same actions were repeated. Am I correct?

A: Yes, sir.

Q: That was in there to buttress your affidavit so you can get a search warrant; wasn't it?

A: No, sir.

Q: It was not?

A: No, sir.

Q: What did you put the sentence in there for if that was not the reason for it?

A: I felt this was the honest truth and what I did to so state it. If I had to so state in my affidavit, then it would be repetitious. I felt that I had enough probable cause with what I did to so state it. If I did not Judge Hazelwood would not have signed it.

Q: If you did not put that sentence in Judge Hazelwood would not have signed it?

A: If I did not have enough probable cause.

. . . . .

Q: My question, sir, is that you put that in to create an atmosphere of probable cause for the magistrate then to make his determination; didn't you?

A: Yes, sir.

Q: Despite the fact that it was just a conclusion and you did not even see it happen; right?

A: It was a conclusion; yes, sir.

Q: And you did not see it happen?

A: That is true.

Tr. 5/2/72: 2.157–2.162.

rant credible and legally sufficient. Compliance with the requirement for an oath by the officer must be regarded as a procedurally adequate manifestation of his veracity. That oath followed by the judge's determination that the facts vouched for show probable cause are all the Constitutions demand and guarantee to our citizens. If the police officers lie, the truth of the accused's alleged criminal activities as revealed by the evidence seized under the warrant will not be diluted. In that event, as the Chief Justice noted in *State v. Burnett, supra,* the accused will have to meet nothing more nor worse than the "truth" at a plenary trial. 42 N.J. at 386, 201 A. 2d at 39. Further, so far as the untruthful officers are concerned, they expose themselves to the sanctions of indictment for perjury or false swearing, a charge of criminal contempt, and assessment of monetary damages in a civil action.

\* \* \* \* \* \*

When applications are made for search warrants the court is not called upon to decide whether the offense charged has in fact been committed. It is concerned only with whether the apparent facts set out in the affidavit are sufficient to lead a reasonably discreet and prudent judge to the belief that the offense charged has been or is being committed. If so probable cause exists for issuance of a warrant. *Dumbra v. United States,* 268 U.S. 435, 45 S.Ct. 546, 69 L.Ed. 1032 (1925). If upon execution of the warrant, evidence of the crime described in the affidavit is seized, it cannot be gainsaid that some measure of corroboration of the truthfulness of the factual allegations of the affidavit arises. This does not mean that the result is being used to establish probable cause for the making of the search. Existence of such cause depends entirely upon the sufficiency of the affidavit presented. But if in spite of the corroboration furnished by the seizure a motion to suppress the evidence because of alleged falsity of the affidavit is to be sanctioned, the hearing thereon will be tantamount to a trial of the merits of the criminal charge, without actually resulting in a determination of the ultimate issue of guilt or innocence.

Recognition of a right in an accused to go behind the adequate showing of probable cause would add a further heavy burden to an already over-burdened criminal trial calendar. It would seriously retard the expeditious disposition of criminal cases without significantly aiding in determination of the ultimate truth of crime charged against the defendant. It is common knowledge that a great number of motions to suppress search warrants are made routinely at the present time on the ground that the supporting affidavit does not sufficiently demonstrate probable cause. The hearings thereon are time-consuming and the results indicate that the motivation is very frequently pursuit of discovery rather than to show lack of compliance with the Fourth Amendment. In our judgment the inevitably increased burden on trial judges that would be added if defendant's suggested attack on the veracity of statements were sanctioned, is not justified by the speculative risk of a rare warrant issued on a false statement.

It must be remembered that the question on such a motion is not guilt or innocence of the defendant; the issue arises only because the search proved productive. Although that result alone could not validate a lawless search, it does serve as a reminder that a balance must be struck, and that the social costs of unwarranted extension of search and seizure principles should not be ignored. If the function of the judge issuing the warrant is to be meaningful, and if the independent exercise of his judgment is to be encouraged whenever the supporting affidavit sufficiently shows probable cause, the truthfulness there-

of should not be relitigated on a motion prior to plenary trial of the issue of guilt or innocence. We think such a rule adequately serves the purpose of the Fourth Amendment, and that sufficient deterrence to the rare false affidavit that may slip by the issuing judge is provided by the sanctions of perjury, contempt and civil damages. 61 N.J. at 173–179, 293 A.2d at 653–656 (Emphasis in original)

The Court's opinion in *Petillo* thus forbade future evidentiary hearings on the veracity of *ex parte* affidavits submitted in support of warrants. In doing so the Court implicitly, indeed explicitly, validated even those warrants which are fraudulently procured by police perjury. That rule was specifically followed in *Albanese* by the Appellate Division, which affirmed the conviction in the face of an attack based on the denial of Albanese's motion to suppress. *State v. Albanese, supra.*

■ This Court must respectfully disagree. Permitting challenge to the veracity of police affidavits in support of applications for search warrants, at least once the target of a search has met some preliminary burden of showing falsehood and has demanded a hearing, is necessary not only to afford due process protection to the victims of possibly unconstitutional searches and seizures, but to protect the courts themselves from becoming unwitting and unwilling "accomplices in the willful disobedience of a Constitution they are sworn to uphold." *Elkins v. United States*, 364 U.S. 206, 223, 80 S.Ct. 1437, 1447, 4 L.Ed.2d 1669 (1960). The Supreme Court of the United States has never had occasion to consider this precise question, although various United States Courts of Appeals, in the exercise of their supervisory power over the lower federal courts, have confronted the issue from time to time.

The ultimate issues raised by these petitions have never been determined by the Supreme Court of the United States. In *Rugendorf v. United States*, 376 U.S. 528, 531–532, 84 S.Ct. 825, 827, 11 L.

Ed.2d 887 (1964) the Court's most recent encounter with the problem of challenges to the veracity of official statements made in support of an application for a search warrant, the Court observed:

Petitioner attacks the validity of the search warrant. This Court has never passed directly on the extent to which a court may permit such examination when the search warrant is valid on its face and when the allegations of the underlying affidavit establish "probable cause"; however, assuming, for the purpose of this decision, that such attack may be made, we are of the opinion that the search warrant here is valid.

In *Rugendorf*, the government affiant in good faith accurately relayed inaccurate information given him by an informant. The Court found the false statements to be immaterial to the finding of probable cause. The Court held that the misrepresentations "were of only peripheral relevancy to the showing of probable cause, and, not being within the personal knowledge of the affiant, did not go to the integrity of the affidavit." 376 U.S. at 532, 84 S.Ct. at 828. This conclusion reflects the exclusionary rule's protection against abusive *official*, and not private, conduct. *Cf. Mapp v. Ohio*, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961). Since *Rugendorf* was a federal criminal case, this Court must also consider whether, whatever the Supreme Court's conclusion might be in the exercise of its supervisory power over the federal courts, the right to challenge the veracity of official statements in support of an application for a search warrant rises to constitutional magnitude, and is accordingly binding on the states under the Fourteenth Amendment.

Although the issue decided in *Petillo* and left open in *Rugendorf* remains undecided by the Supreme Court, most recent federal decisions have acknowledged that the subject of a search warrant has the right to inquire into the truthfulness of the underlying affidavits, at

least under some circumstances. *United States v. Belculfine*, 508 F.2d 58, 63 (1st Cir. 1974)(intentional misstatements invalidate the warrant); *United States v. Gonzalez*, 488 F.2d 833 (2nd Cir. 1973) (dicta); *King v. United States*, 282 F.2d 398, 400 at n. 4 (4th Cir. 1960)(dicta); *United States v. Thomas*, 489 F.2d 664 (5th Cir. 1974) (en banc) (any misrepresentation committed with intent to deceive the magistrate, or any material misrepresentation, regardless of intent, requires suppression); *United States v. Carmichael*, 489 F.2d 983 (7th Cir. 1973)(en banc)(either a material or an intentional official misrepresentation requires suppression); *United States v. Marihart*, 492 F.2d 897 (8th Cir. 1974) (same); *United States v. Damitz*, 495 F.2d 50, 55 (9th Cir. 1974) (dictum); *United States v. Harwood*, 470 F.2d 322, 324–325 (10th Cir. 1972); *United States v. Thornton*, 147 U.S.App.D.C. 114, 454 F.2d 957, 967 (1971)(dictum); *cf. United States v. James*, 161 U.S.App.D.C. 88, 494 F.2d 1007, 1016 (1974). *See generally* Kipperman, "Inaccurate Search Warrant Affidavits as a Ground for Suppressing Evidence," 84 Harv.L.Rev. 825 (1971); Forkosch, "The Constitutional Right to Challenge the Content of Affidavits in Warrants Issued under the Fourth Amendment," 34 Ohio St.L.J. 297 (1973); Sevilla, "The Exclusionary Rule and Police Perjury," 11 San Diego L. Rev. 839 (1974); Grano, "A Dilemma for Defense Counsel: Spinelli-Harris Search Warrants and the Possibility of Police Perjury," 1971 U.Ill.L.F. 405.

The issues of permissible challenge to the veracity of affidavits submitted in support of applications for search warrants, and the standards to be used in evaluating such challenges, if permissible, remain open in the Third Circuit. Neither petitioner nor respondent has directed the Court's attention to any case decided in this Circuit on these issues. Nevertheless, two cases appear relevant to the issues presented by these petitions: *United States ex rel. Laws v. Yeager*, 448 F.2d 74 (1971), *cert. denied*, 405 U.S. 976, 92 S.Ct. 1201, 31 L.Ed.2d 251 (1972); *United States v. Wolfe*, 375 F.Supp. 949 (E.D.Pa.1974). Only *Laws* was a habeas corpus petition.

In *Laws*, petitioner argued on appeal that even if probable cause existed at the time application was made for the search warrant, it had been developed at trial that much of the information contained in the affidavit sworn in support of the warrant application was false, and therefore the seized evidence should have been suppressed. Petitioner argued "that when an affidavit is false or inaccurate and leads to the issuance of a warrant, the subsequent search and seizure based on that warrant is invalid." 448 F.2d at 84. The Court rejected the petition on the grounds that petitioner had been granted a pretrial suppression hearing in state court, and had failed to raise the veracity claim there, seeking instead to use inconsistent material, revealed at trial, initially on appeal. The Court of Appeals found the inconsistencies developed at trial to have been untimely raised on appeal, and in any event trivial, since they "[did] not destroy the essential integrity of the affidavit." *Id.*

In *United States v. Wolfe, supra,* the most recent case in this Circuit dealing with the sufficiency of challenged affidavits, Judge Hannum, in reliance on *Carmichael* and *Thomas,* apparently recognized that a wilful falsification in an affidavit for a warrant will invalidate the search. He conducted an appropriate evidentiary hearing, but found no such wilful falsification or intent to deceive in the case before him. 375 F. Supp. at 954–955.

It is the opinion of this Court that a warrant procured by material and knowing misstatements of fact is inimical to the Fourth Amendment of the Constitution and cannot stand. The subject of such a search must therefore be afforded, upon a proper *prima facie*

showing, some opportunity to prove the existence of such misstatements.[12] It is the Constitution itself which has placed the magistrate between the state and the individual. *Cf. Johnson v. United States*, 333 U.S. 10, 14, 68 S.Ct. 367, 92 L.Ed. 436 (1948). Where there are no exigent circumstances, a policeman may not search an individual's person or home without first satisfying the magistrate that there is probable cause to do so. The Constitution does not contemplate that the judicial obstacle it has set in the path of arbitrary searches may be vaulted by the knowingly false and deceptive representations of those who seek to search. Indeed, there is a special need to permit the factual testing of an affidavit upon which a warrant is based, if we are to protect the judicial system itself from improper use by the unscrupulous. When a warrant is issued and then used to search, it is the court's own writ which sanctions the officer's intrusion upon the home or person of a citizen. It is of paramount importance to the integrity of the judicial process that such writs not be procured by perjury, deception or other improprieties. It is of equal importance to the integrity of the judicial process that courts, which authorize the

infringement of otherwise protected areas of a citizen's privacy, give such a citizen a fair hearing when he claims to have been unjustifiably aggrieved thereby.

It is true that police officers are often presumed to be telling the truth, and equally true that "it would be a dismal reflection on society to say that when the guardians of its security are called to testify in court under oath, their testimony must be viewed with suspicion." *Bush v. United States*, 126 U.S.App. D.C. 174, 375 F.2d 602, 604 (1967) (Burger, J.) Nevertheless, as Mr. Justice Frankfurter wrote: "[T]here comes a point where this Court should not be ignorant as judges of what we know as men." *Watts v. Indiana*, 338 U.S. 49, 52, 69 S.Ct. 1347, 1349, 93 L.Ed. 1801 (1949). Both commentators and courts have recognized the incidence of police perjury in criminal proceedings of all types. *See* Sevilla, "The Exclusionary Rule and Police Perjury," 11 S.Diego L.Rev. 839, 836–875 (1974). Just as the basis of the exclusionary rule has properly been described as "the imperative of judicial integrity," *Elkins v. United States, supra,* 364 U.S. at 222, 80 S.Ct. 1437, so too is the exposure of police perjury essential not only to the

12. The suggestion is made in *Petillo* that the routine granting of evidentiary hearings to challenge search warrant affidavits would delay criminal trials excessively, and in any event, "is not justified by the speculative risk of a rare warrant issued on a false statement." 61 N.J. at 178, 293 A.2d at 655.

Some states, like New Jersey, permit no evidentiary hearing under any circumstances. Other jurisdictions permit such challenges as a matter of course, with no burden placed on the defendant to make any pre-hearing showing. *See e. g., State v. Petillo, supra,* at 174–176, 293 A.2d 649, for a list of cases supporting both positions. *Cf.* Note, "Search Warrant Affidavits—the Constitutional Constraints," 23 Drake L.Rev. 623, 636, nn. 72–74 (1974). The federal courts, while not uniform, will at the minimum permit a hearing upon a showing by the target of a search that there is reason to believe that the *ex parte* affidavit submitted to obtain the warrant is inaccurate or perjurious It has never been demonstrated that justice

comes any speedier in jurisdictions where such hearings are not available.

In any event, this Court need not decide, in the limited controversy before it, the full extent to which the Due Process Clause requires a state to afford the subject of a search made pursuant to warrant a hearing on the veracity of the factual allegations in the affidavit used to obtain that warrant. The question whether only deliberate falsehood will require suppression, as opposed to to the affiant's negligent or reckless error, need not be resolved here. This Court holds only that where, as here, the subject of a search conducted pursuant to warrant has made a *prima facie* showing that the policeman who procured the warrant deliberately lied to the issuing magistrate, or otherwise wilfully deceived him with regard to a material fact, the Fourth Amendment renders his contention material to a federally-protected right and remedy and therefore the Due Process Clause requires that he be afforded a full, fair and adequate hearing before that remedy is denied.

rights of the individual, but to the preservation of a judicial system which deserves the respect it demands. Mr. Justice Holmes stated the principle long ago:

> We have to choose, and for my part I think it a less evil that some criminals should escape than that the government should play an ignoble part.
>
> For those who agree with me no distinction can be taken between the government as prosecutor and the government as judge. If the existing [criminal] code does not permit district attorneys to have a hand in such dirty business it does not permit the judge to allow such iniquities to succeed.

*Olmstead v. United States,* 277 U.S. 438, 470, 48 S.Ct. 564, 575, 72 L.Ed. 944 (1928)(dissenting opinion). In the same case, Mr. Justice Brandeis wrote:

> Decency, security, and liberty alike demand that government officials shall be subjected to the same rules of conduct that are commands to the citizen. In a government of laws, existence of the government will be imperiled if it fails to observe the law scrupulously. Our government is the potent, the omnipresent teacher. For good or for ill, it teaches the whole people by its example. Crime is contagious. If the government becomes a lawbreaker, it breeds contempt for law; it invites every man to become a law unto himself; it invites anarchy. To declare that in the administration of the criminal law the end justifies the means— to declare that the government may commit crimes in order to secure the conviction of a private criminal—would bring terrible retribution. Against that pernicious doctrine this court should resolutely set its face.

277 U.S. at 485, 48 S.Ct. at 575 (dissenting opinion).

Every experienced litigator and jurist knows that witnesses are not always truthful, and that sometimes a judgment will be improvidently granted based on a misplaced belief in the integrity of the evidence adduced. No system of justice worthy of the name, however, could willingly countenance the continued validity of such process once the falsity of its underpinning has been conclusively and timely demonstrated. The suggestion that "[i]f the police officers lie, the truth of the accused's alleged criminal activities as revealed by the evidence seized under the warrant will not be diluted," *State v. Petillo, supra,* 61 N.J. at 174, 293 A.2d at 653, ignores the teaching of countless cases, from *Boyd v. United States,* 116 U.S. 616, 6 S.Ct. 524, 29 L.Ed. 746 (1886), to *Weeks v. United States,* 232 U.S. 383, 34 S.Ct. 341, 58 L. Ed. 652 (1914) to *Mapp v. Ohio,* 367 U. S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961). Though the criminal may "go free because the constable has blundered," *People v. Defore,* 242 N.Y. 13, 21, 150 N.E. 585, 587 (1926) (Cardozo, J.), or because the constable has lied, at least "it is the law that sets him free." 367 U.S. at 659, 81 S.Ct. at 1694.

Judicial officers are confronted with the need to test probable cause against a factual presentation in two general search-and-seizure situations. The first arises when a police officer has conducted a search and seizure without prior judicial authority, based on a valid arrest supported by probable cause, or on another of the established exceptions to the warrant requirement of the Fourth Amendment. The other is presented when the officer, prior to any search, appears before a magistrate to seek authority to search and to seize, based on his sworn account of facts and circumstances which would justify the judge in determining that probable cause exists to issue the warrant.

It would be inconceivable to permit a police officer, after a warrantless arrest and search, to appear *ex parte* before a judge to testify to the events which led to the defendant's arrest and search, without fear of contradiction and untested by cross-examination, and on the basis of these uncontestable "facts,"

thereafter to limit the defendant to an argument on the *legal* conclusion of probable cause. Such a rule would invite perjury, and would violate fundamental concepts of due process. Yet if the *only* proper question were guilt or innocence, courts could properly permit subsequent *ex parte* testimony.

Even the grant of an adversary hearing after a warrantless search is no guarantee that police misconduct will be deterred, either in the home of the citizen or in the courthouse itself.[13] Nonetheless, an adversary hearing after a warrantless search is the only meaningful device we have to discover what events actually occurred in the case then before the court.

There is a difference, of course, when the officer appears before the judge prior to the search. Obviously, the proceeding at this stage must be *ex parte*. There would be little point to any search if, before procuring a warrant, the police were required to give notice to the suspect and to invite him to the Hall of Justice for a contested hearing. It is for this reason, born of clear necessity, that the officer makes his sworn factual showing *ex parte*, with no contemporary opportunity for the intended subject of the search to cross-question or to produce evidence which may impeach or discredit the officer or his assertions.

This procedure does not mandate, however, that the police never account

13. As graphically demonstrated by the Ninth Circuit in *United States v. Marshall*, 488 F. 2d 1169, 1170–1171 (9th Cir. 1973):

These appeals present a distressing picture of the notions of the agents of the Bureau of Narcotics and Dangerous Drugs of the Department of Justice who were involved in the case about the manner in which they are to perform their duties and their obligations toward citizens under the Constitution, and about their behavior toward the citizens with whom they become involved. We hope that the agents who testified in this case are not typical agents of the Bureau. If they are, we wonder what sort of training the Bureau gives its agents.[1]

1. The agents involved speak an almost impenetrable jargon. They do not get into their cars; they enter official government vehicles. They do not get out of or leave their cars, they exit them. They do not go somewhere; they proceed. They do not go to a particular place; they proceed to its vicinity. They do not watch or look; they surveille. They never see anything; they observe it. No one tells them anything; they are advised. A person does not tell them his name; he identifies himself. A person does not say something; he indicates. They do not listen to a telephone conversation; they monitor it. People telephoning to each other do not say "hello;" they exchange greetings. An agent does not hand money to an informer to make a buy; he advances previously recorded official government funds. To an agent, a list of serial numbers does not list serial numbers, it depicts Federal Reserve Notes. An agent does not say what an exhibit is; he says that it purports to be. The agents preface answers to simple and direct questions with "to my knowledge." They cannot describe a conversation by saying "he said" and "I said;" they speak in conclusions. Sometimes it takes the combined efforts of counsel and the judge to get them to state who said what. Under cross-examination, they seem unable to give a direct answer to a question; they either spout conclusions or do not understand. This often gives the prosecutor, under the guise of an objection, an opportunity to suggest an answer, which is then obligingly given.

Two of the agents seem quite willing to make false affidavits, in which facts are distorted to achieve a result, such as a finding that seized evidence was in plain view. One agent, when confronted with the facts demonstrating that his affidavit was false, did not admit that it was false; it was merely "inconsistent." These agents do not search a citizen; they "frisk" him, even if that involves fishing paper money out of his pocket and his wallet. Their fear for their own safety approaches paranoia. Even when 6 or 8 agents, all armed, have a group of citizens herded into a room, a search of a citizen's wallet is justified on the ground that it might contain a razor blade. These agents do not break into a house without a warrant; they "secure" it, even if this means rushing in with drawn guns, rounding up everyone in the place and searching them all. They do this for their own protection. They seem to think that every citizen must carry some sort of identity card or paper, which they call "I.D.", and must display it to them on demand. [footnote omitted]

for what they have sworn to the judge, and that the target of the warrant never be heard at all. It merely means that the accounting must be postponed until after the warrant has issued and the search been conducted. At that time, the warrant is open to question and the regular process which attends all judicial proceedings applies.

Judges are not omniscient. They have no special ability to determine that they are being deceived when they deal *ex parte* with experienced police officers who testify routinely in court. When the policeman appears *ex parte* before the magistrate to procure a warrant, with his affidavit, the judicial officer has no divining rod to determine whether the affidavit is true or false. All he can do is read it, and if it is not internally inconsistent, all that is left him is the legal conclusion whether the "facts" asserted in the affidavit establish probable cause. Any factual finding or legal conclusion he reaches can only be tentative, and will never have been "litigated." [14]

Moreover, courts in New Jersey and elsewhere routinely grant hearings at which the target of a search by warrant may subsequently demonstrate that the underlying affidavit was legally insufficient. If it is improper for a police officer to testify *ex parte* to establish a factual basis for his conclusion of probable cause after a warrantless search, it is equally improper after a search with a warrant to reintroduce earlier *ex parte* assertions to establish a factual basis for the magistrate's subsequent legal conclusion of probable cause. Moreover, it is far from clear why a court will grant suppression after a subsequent adversary hearing which establishes that the issuing magistrate erroneously found probable cause as a matter of law, from facts presented to him *ex parte*, but will deny the remedy or even a hearing where the claim is that the magistrate's justifiable legal conclusion was based on a factual presentation which, unknown to him, was materially false.[15]

 If police perjury is to be exposed, fundamental fairness requires

---

14. The Superior Court of New Jersey, in an opinion approved for publication, has recently held that a magistrate may properly authorize a warrant by telephone. *State v. Cymerman*, N.J.Super., 343 A.2d 825 (1975). Apparently, the procedure to be employed is to swear the policeman over the telephone, to let him read his affidavit into the telephone, and then telephonically to notify him whether the warrant is approved.

Thus, while it is true that the issuing magistrate always has the right to ask supplemental questions, the above procedure, whether or not valid under New Jersey or federal law, demonstrates that although the magistrate is in a good position to decide whether a legally-sufficient showing of probable cause has been made, his "fact-finding" function is minimal in an *ex parte* proceeding. New Jersey would permit the subject of a search authorized by warrant to demonstrate that the legal evaluation of probable cause made by the magistrate was erroneous, but would deny him the opportunity to challenge the "factual" showing made to the magistrate, on the ground that "[i]f the function of the judge issuing the warrant is to be meaningful, and if the independent exercise of his judgment is to be encouraged whenever the supporting affidavit sufficient-

ly shows probable cause, the truthfulness thereof should not be *relitigated* . . . ." *State v. Petillo, supra,* 61 N.J. at 178, 293 A.2d at 656. (Emphasis added)

15. One commentator has noted this paradox:

. . . While some courts still adhere to the view that the magistrate's or commissioner's ruling on probable cause is final, they offer little reasoning to support their conclusions. The only rationales for this position offered by commentators have been that review of an affidavit's validity would make the issuance of a warrant more mechanical and less a solemn judicial act, and that review by the trial court would confuse the ultimate question of guilt with a factual question of the affiant's truthfulness. The first objection hardly warrants a "no challenge" rule given that courts since *Mapp* habitually review the *sufficiency* of affidavits without any apparent demoralizing of the warrant-issuing process. Reviewing the *validity* of the affiant's allegations seems even more justifiable than reviewing their sufficiency since the warrant is issued in an *ex parte* hearing where the magistrate's only

that the courts permit aggrieved citizens to show that such perjury has occurred. A court rule barring any test of the veracity of *ex parte* search warrant affidavits by the subject of the search promotes little that is worthy and invites much that is unwholesome, both in the courthouse and in society at large. At the minimum, the Fourth Amendment and the Due Process Clause require, upon a *prima facie* showing of misrepresentations in the supporting affidavit, a full, fair and adequate hearing to determine whether the issuing magistrate was deceived, and the constitutional requirements deliberately subverted.

What will constitute a *prima facie* showing in this context will, of course, vary according to the facts of the case. "A litigating party is said to have a *prima facie* case when the evidence in his favor is sufficiently strong for his opponent to be called on to answer it. A *prima facie* case, then, is one which is established by sufficient evidence, and can be overthrown only by rebutting evidence adduced on the other

side." Black's Law Dictionary, Revised Fourth Ed., at 1353 (1968). In the instant context, it may be said that a *prima facie* showing of deliberate lies to the issuing magistrate by the police affiant has been made where a fair-minded person, recognizing that the Constitution prohibits resort to warrants which depend upon perjury, would find it fundamentally unfair to stifle the inquiry.

We speak now not of " . . . relitigation of the truth of the factual basis for issuance of the warrant," *State v. Petillo, supra,* 61 N.J. at 174, 293 A.2d at 653 for no *ex parte* determination of "truth" or "factual basis" is the kind of initial "litigation" which makes a subsequent adversary hearing redundant. The issue, as this Court sees it, is not whether the exclusionary rule is a good rule or a bad rule, nor even, as suggested in *Petillo,* whether "sufficient deterrence to the rare false affidavit that may slip by the issuing judge is provided by the sanctions of perjury, contempt and civil damages." 61 N.J. at 178–179, 293 A.2d at 656.[16]

check on the affiant's veracity is a search for internal inconsistency in his statement. Kipperman, "Inaccurate Search Warrant Affidavits as a Ground for Suppressing Evidence," 84 Harv.L.Rev. 825, 830 (1971) (footnotes omitted.)

16. The Court notes, however, that experience has demonstrated that few such proceedings are ever brought by the State, no matter how egregious the police conduct. *See* Sevilla, "The Exclusionary Rule and Police Perjury," 11 S.Diego L.Rev. 830, 845–859 (1974). Even if it were proper to shift the burden of enforcement of the Fourth Amendment against police misconduct from the State to the individual, the victim of an illegal search will often be unable to institute subsequent civil or criminal proceedings designed to deter future malfeasance. Generally the victim vindicates his Fourth Amendment rights in the criminal proceeding where the fruits of the search are to be used, or not at all.
After he has been convicted by use of tainted evidence, he is in a poor position to sue. He may then be incarcerated. Having gone through one suit already, he may not have funds for counsel. Once convicted, his credibility is open to greater attack, perhaps

even by use of the very conviction which he claims to have been the result of illegal police conduct. Finally, even if such an individual could sue successfully, his measure of damages is likely to be difficult to ascertain. On the other hand, if the victim of such a search has escaped conviction, he is often happy enough to put the entire affair behind him, and reluctant to expose himself to further police scrutiny or hostility, either real or imagined.
The hope that sufficient deterrence to this kind of police misconduct is to be found in the available sanctions of perjury, contempt and civil damages may therefore be illusory, and the treatment of the Fourth Amendment allegations in *Petillo* demonstrates this unhappy conclusion.
The Court and counsel for the State had the following colloquy in this regard:
THE COURT: I have one final question to ask you. Justice Francis in his opinion, I think you will agree, will you not, expressed great confidence in the state system of justice's ability to deal with instances which no doubt will be rare when law enforcement officials will, themselves, perjure themselves. You will recall that he expressed that confidence, did he not?
MR. COHEN: Yes.

THE COURT: . . . [W]hat was done in this case, this very case, to establish whether or not the policeman made an honest mistake or committed perjury?

MR. COHEN: Well, I'd have to speak to the people who were involved at the time. I don't know what was done. I only know as much as you know, what we see before us as reflected in the record. I was not involved in the case.

THE COURT: If there was a ready explanation for the mistake here, why was the State so anxious to prohibit the defendant from cross-examining the policeman about this at the trial, itself?

MR. COHEN: Well, your Honor, I'm not submitting that this is what happened. I'm saying it is possible. It is equally apparent that this thought never occurred at that time.

THE COURT: It is possible, also, that when Petillo entered his home even with a horse sheet and a paper bag that he went there for some innocent purpose; that is possible, too, isn't it?

MR. COHEN: Sure.

THE COURT: But the State vigorously investigated to see whether that possibility was real or whether on the other hand he was guilty of criminal conduct, didn't they?

MR. COHEN: Absolutely.

THE COURT: Didn't the State also vigorously investigate to see whether or not the policeman's affidavit which was possibly incorrect was also on the other hand criminal conduct?

MR. COHEN: As I stated, I can't give you an answer to that. I don't know. I would suspect, as I'm sure you suspect, that the same type of criminal investigation into the possible false swearing by the trooper here was not conducted as was conducted into the criminal activity of the defendant.

THE COURT: Which is the greater crime?

MR. COHEN: Which is the greater crime?

THE COURT: If you had to allocate your resources as a public prosecutor, as public prosecutors sometimes have to do, which do you think merits the closest possible scrutiny?

MR. COHEN: Well, given the fact that —I'm not going to go into the whole bit about organized crime. Gambling does not offend many people.

THE COURT: I'm not asking you that.

MR. COHEN: On the scale of hierarchy, which is more important? I can't give an answer to that. I don't know. . . .

THE COURT: Somebody is making that judgment, aren't they? If, as you suspect, as you say, there has been no vigorous investigation to see whether or not a law enforcement officer perjured himself, somebody is making that determination and apparently in derogation of the full expectations of the Supreme Court of New Jersey.

MR. COHEN: I wouldn't say that. I would say that it would be quite unreasonable to assume that in every criminal case there is going to be an offshoot investigation conducted as to whether or not he police are telling the truth. That would require another police force to police the police.

And I can anticipate your next response to that and that is okay, only where there is some indication that—

THE COURT: Of course. That is an obvious response. I think you would agree on reflection, Mr. Cohen, that this is not every criminal case.

MR. COHEN: Absolutely not.

\* \* \* \* \*

Tr. 8/27/74: 85–87.

THE COURT: Did the State ever ascertain it was a true statement or possibly perjurious?

MR. COHEN: Did the State ever ascertain that?

THE COURT: Yes. Or attempt to.

MR. COHEN: I don't think it attempted to do beyond whatever it was that the Assistant Prosecutor who handled the motion to suppress did between July and October.

THE COURT: Based on what he did, he came into Court and said he couldn't possibly dispute the fact that he wasn't the one who did it.

MR. COHEN: I don't know any more than you do what was behind that; whether he satisfied himself that the trooper made a mistake here. If he didn't —if he satisfied himself that the trooper lied, then I agree.

\* \* \* \* \*

THE COURT: I'll read it to you.

MR. COHEN: Okay.

THE COURT: "I honestly feel, whether or not the policeman was right or wrong, that he felt he was doing his job. He exaggerated testimony and I have no question about that, your Honor. I have no question that he did not hear, unless there was collusion"—which means, Mr. Cohen, collusion between Mr. Petillo and the phone company. "I have no question that he did not hear, unless there was collusion which we cannot prove, he did not hear anybody on the other end of the line."

MR. COHEN: Your Honor, I concede if that be the case, if that is his conclusion,

The question presented here, rather, requires only the recognition that a warrant procured by perjury is no more valid than any other court process, writ or order which is issued in reliance on false swearing. Such an order is a nullity, and can never be deemed to constitute compliance with the Fourth Amendment's command to proceed by warrant. A search conducted pursuant to a warrant so procured is a search without any warrant at all. If the ultimate result is to suppress the fruits of such a search, because the Fourth Amendment also commands that the fruits of searches which violate that Amendment be suppressed, so be it. *Mapp v. Ohio, supra.* It is no answer to say that sufficient deterrence is found in other laws, and that therefore the command of the Fourth Amendment to suppress the fruits of an illegal search may be avoided by preventing any inquiry into whether the search is illegal.[17]

---

if his grounds for—if there are grounds for that conclusion—

THE COURT: He is a member of your office.

MR. COHEN: Yes. Then there should have been investigation. I don't know whether there was or not.

Tr. 8/27/74: 89–90.

17. In *United States v. Peltier*, 422 U.S. 531, 95 S.Ct. 2313, 45 L.Ed.2d 374 (1975), the Court reviewed the purposes and limitations of the exclusionary rule. Mr. Justice Rehnquist observed, for the Court, that the rule was designed to support "the imperative of judicial integrity" to prevent the courts from becoming "accomplices in the willful disobedience of a Constitution they are sworn to uphold." *Elkins v. United States*, 364 U.S. 206, 222–223, 80 S.Ct. 1437, 1447, 4 L.Ed.2d 1669 (1960). The Court reiterated in *Peltier* that the exclusionary rule of *Mapp* was prospective only, *Linkletter v. Walker*, 381 U.S. 618, 85 S.Ct. 1731, 14 L.Ed.2d 601 (1965), precisely because "the introduction of evidence which had been seized by law enforcement officials *in good-faith compliance with then-prevailing constitutional norms*" would not offend the integrity of the judicial process. 422 U.S. at 536, 95 S.Ct. at 2317. (Emphasis added)

The Court synthesized the retroactivity cases in language which bears closely upon the issues presented by the instant petitions:

It would seem to follow *a fortiori* from the *Linkletter* and *Fuller* [*Fuller v. Alaska*, 393 U.S. 80, 89 S.Ct. 61, 21 L.Ed.2d 212 (1969)] holdings that the "imperative of judicial integrity" is also not offended if law enforcement officials reasonably believed in good faith that their *conduct* was in accordance with the law even if decisions subsequent to the search or seizure have held that conduct of the type engaged in by the law enforcement officials is not permitted by the Constitution.

422 U.S. at 537, 95 S.Ct. at 2317.

(Emphasis in original)

The Court reasoned that the deterrent purpose of the exclusionary rule can be served only where law enforcement officers violate the Constitution with knowledge that their conduct is improper, and that the rule is therefore not applicable "to cases in which its deterrent purposes would not be served." *Desist v. United States*, 394 U.S. 244, 254 n. 24, 89 S.Ct. 1030, 1036, 22 L.Ed.2d 248 (1969). The Court continued:

This focus in the retroactivity cases on the purposes served by the exclusionary rule is also quite in harmony with the approach taken generally to the exclusionary rule. In *United States v. Calandra*, 414 U.S. 338, 348 [94 S.Ct. 613, 620, 38 L.Ed. 2d 561] (1974), we said that the exclusionary rule "is a judicially created remedy designed to safeguard Fourth Amendment rights generally through its deterrent effect, rather than a personal constitutional right of the party aggrieved." It follows that "the application of the rule has been restricted to those areas where its remedial objectives are thought most efficaciously served." *Ibid*. We likewise observed in *Michigan v. Tucker*, 417 U.S. 433, 447 [94 S.Ct. 2357, 2365, 41 L.Ed.2d 182] (1974):

"The deterrent purpose of the exclusionary rule necessarily assumes that the police have engaged in willful, or at the very least negligent, conduct which has deprived the defendant of some right. By refusing to admit evidence gained as a result of such conduct, the courts hope to instill in those particular investigating officers, or in their future counterparts, a greater degree of care toward the rights of an accused. Where the official action was pursued in complete good faith, however, the deterrence rationale loses much of its force."

422 U.S. at 538, 95 S.Ct. at 2318.

It may be that the exclusionary rule ought not and will not be applied to mere police "blunders." Even such a view, however, would exclude the knowing misrepresentation of facts to the issuing magistrate by the police affiant, which remains squarely within

the zone at which the exclusionary rule is aimed.

There is some question, however, whether the exclusion remedy for Fourth Amendment violations ought to be viewed as of constitutional dimension for purposes of collateral attack by petition for a writ of habeas corpus, where the constitutional claim has little or no bearing upon the issue of guilt or innocence or upon the integrity of the fact-finding process, and where the asserted deterrent purposes of the exclusionary rule are likely to be so attenuated as no longer to warrant its application. A majority of the Supreme Court, however, still views the receipt of unconstitutionally-seized evidence at trial to be cognizable by petition for habeas corpus.

In *Schneckloth v. Bustamonte*, 412 U.S. 218, 242, 93 S.Ct. 2041, 2055, 36 L.Ed.2d 854 (1973) the Court observed:

The protections of the Fourth Amendment are of a wholly different order, and have nothing whatever to do with promoting the fair ascertainment of truth at a criminal trial. Rather, as Mr. Justice Frankfurter's opinion for the Court put it in *Wolf v. Colorado*, 338 U.S. 25, 27 [69 S. Ct. 1359, 1361, 93 L.Ed. 1782], the Fourth Amendment protects the "security of one's privacy against arbitrary intrusion by the police . . . ." In declining to apply the exclusionary rule of *Mapp v. Ohio*, 367 U.S. 643 [81 S.Ct. 1684, 6 L.Ed.2d 1081], to convictions that had become final before rendition of that decision, the Court emphasized that "there is no likelihood of unreliability or coercion present in a search-and-seizure case," *Linkletter v. Walker*, 381 U.S. 618, 638 [85 S.Ct. 1731, 1742, 14 L.Ed.2d 601]. In *Linkletter*, the Court indicated that those cases that had been given retroactive effect went to "the fairness of the trial—the very integrity of the fact-finding process. Here . . . the fairness of the trial is not under attack." *Id.*, at 639 [85 S.Ct. [1731] at 1743]. The Fourth Amendment "is not an adjunct to the ascertainment of truth." The guarantees of the Fourth Amendment stand "as a protection of quite different constitutional values—values reflecting the concern of our society for the right of each individual to be let alone. To recognize this is no more than to accord those values undiluted respect." *Tehan v. United States ex rel. Shott*, 382 U.S. 406, 416 [86 S.Ct. 459, 465, 15 L.Ed.2d 453].

The concurring opinion of Mr. Justice Powell in *Bustamonte*, 412 U.S. at 250, 93 S.Ct. 2041, in which the Chief Justice and Mr. Justice Rehnquist joined and with which Mr. Justice Blackmun associated himself, 412 U.S. at 249, 93 S.Ct. 2041, addresses the question whether a violation of the exclusionary rule may be raised by a state or federal prisoner in a collateral attack on his conviction, which the majority found unnecessary to decide. 412 U.S. at 249, n. 38, 93 S.Ct. 2041. The concurring opinion would apparently overrule the holding of *Kaufman v. United States*, 394 U.S. 217, 89 S.Ct. 1068, 22 L.Ed.2d 227 (1969), in which a divided court permitted collateral review of search-and-seizure claims on motions by federal prisoners pursuant to Title 28 U.S.C. § 2255. The concurring Justices preferred the prior majority rule, as summarized and rejected by the Court in *Kaufman*:

The denial of Fourth Amendment protection against unreasonable searches and seizures, the Government's argument runs, is of a different nature from denials of other constitutional rights which we have held subject to collateral attack by federal prisoners. For unlike a claim of denial of effective counsel or of violation of the privilege against self-incrimination, as examples, *a claim of illegal search and seizure does not impugn the integrity of the fact-finding process or challenge evidence as inherently unreliable; rather, the exclusion of illegally seized evidence is simply a prophylactic device intended generally to deter Fourth Amendment violations by law enforcement officers. Id.*, [394 U. S.] at 224 [89 S.Ct. [1068] at 1073].

412 U.S. at 251, 93 S.Ct. at 2060. (Emphasis added)

The thesis of the concurring opinion is stated succinctly:

In short, on petition for habeas corpus or collateral review filed in a federal district court, whether by state prisoners under 28 U.S.C. § 2254 or federal prisoners under § 2255, the present rule is that Fourth Amendment claims may be asserted and the exclusionary rule must be applied in precisely the same manner as on direct review. Neither the history or purpose of habeas corpus, the desired prophylactic utility of the exclusionary rule as applied to Fourth Amendment claims, nor any sound reason relevant to the administration of criminal justice in our federal system justifies such a power.

*Id.*

Mr. Justice Powell criticized the extention of the writ of habeas corpus to situations where "a convicted defendant is . . . asking society to redetermine a matter with no bearing at all on the basic justice of his incarceration." 412 U.S. at 256, 93 S.Ct. at 2063. The instant case, in the view of this Court, presents a hybrid context; although the claim asserted concerns a search and seizure effected pursuant to an allegedly in-

valid warrant, the rule of *State v. Petillo*, precluding post-warrant judicial inquiry into the veracity of the police affidavits upon which the warrant was based, must inevitably impugn "the basic justice" of petitioner's incarceration. It is well to criticize the formalistic application of the exclusionary rule to defeat "our societal interest in a rational legal system" while serving "no compensating ends of personal justice." 412 U.S. at 258, 93 S.Ct. at 2064. The same criticism must be directed, however, at approval of merely formalistic compliance with the requirements of the Fourth Amendment warrant process.

Indeed, even the concurring Justices in *Bustamonte*, who would reduce the scope of the exclusionary rule on collateral review, recognize the necessity of a full and fair hearing of Fourth Amendment claims in either state or federal court:

> Where there is no constitutional claim bearing on innocence, *the inquiry of the federal court on habeas review of a state prisoner's Fourth Amendment claim should be confined solely to the question of whether the defendant was provided a fair opportunity in the state courts to raise and have adjudicated the Fourth Amendment claim.*

412 U.S. at 266, 93 S.Ct. at 2067. (Emphasis added)

Upon examination of the instant record within the scope of review suggested by Mr. Justice Powell, the Court must conclude that both petitioners were denied a full and fair hearing on their Fourth Amendment claims, in violation of the Due Process Clause of the Fourteenth Amendment, and that the State's failure to produce the unnamed informant at the motion to suppress deprived petitioner Petillo of due process of law.

The State has submitted to this Court as unsolicited *amicus curiae* brief prepared for the consideration of the Supreme Court of the United States in *Rice v. Wolff*, 513 F.2d 1280 (8th Cir. 1975), *cert. granted sub nom., Wolff v. Rice*, 422 U.S. 1055, 95 S.Ct. 2677, 45 L.Ed.2d 707 (1975). In that brief, the State contends that the United States Supreme Court "foisted" the exclusionary rule upon the States in *Mapp v. Ohio, supra*, where the Court found exclusion of illegally obtained evidence to be "an essential part of both the Fourth and Fourteenth Amendments." 367 U.S. at 657, 81 S.Ct. at 1693; Brief of the State of New Jersey, Amicus Curiae, at 11. [hereinafter Amicus Brief] New Jersey properly observes in its *Wolff* brief that "[i]f a policeman has broken the law, he should be punished," Amicus Brief at 18, but maintains that the exclusionary rule does not accomplish that end. The reasoning underlying that contention reveals much with regard to the present petitions:

> In view of new realities, the judicial system protests its virtue too much. Indeed, if policemen injure themselves to uphold their conduct, the system's integrity has suffered whether or not the conduct is upheld. First, it fosters criminal activity. Second, the police response may be equally criminal. Third, it produces perjury. No system of justice can claim integrity when it creates such disfunctional conflict. In addition,

> [We] must be mindful that the contest is not between the State and the individual. The contest is wholly between competing rights of the individual—the right to be protected from criminal attack and the several rights in the Amendments. When the truth is suppressed and the criminal is set free, the pain of suppression is felt, not by the inanimate State or by some penitent policeman, but by the offender's next victims for whose protection we hold office. In that direct way, *Mapp* denies the innocent the protection due them.

> \*　　\*　　\*　　\*　　\*

> But *Mapp* as applied calls for suppression whenever a search is found to violate the Amendment, even by a bare majority of a court, and notwithstanding that the policeman and the magistrate acted without a trace of insolence.

*State v. Bisaccia*, 58 N.J. 586, 590, 279 A.2d 675 (1971).

> If insolence is to be deterred, other remedies can be effected.

> Nonetheless, in some cases the egregiousness of the police conduct may still demand suppression of evidence. However, there is no reason that such conduct be defined as "unreasonable" on the basis of current standards. Other parameters exist, such as bad faith, or intrusion disproportionate to the protection needed, while basic notions of due process would continue to assure the integrity of the judicial systems in extreme cases of official misconduct.

> Of these possibilities, in addition to strong civil remedies, *amicus curiae* respectfully submits that Fourth Amendment rights can be protected adequately by judging searches and seizures according to the good faith of the officers involved. Bad faith police conduct would still not preclude suppression of evidence. However, good faith police conduct need not be penalized.

Amicus Brief, at 19–20 (Footnote omitted) New Jersey concedes, in its argument to the United States Supreme Court, that bad faith misconduct by police justifies exclusion of the resulting evidence, even under the re-

Such a rule is not only violative of the Fourth Amendment, but to the extent that it seeks to deprive the target of a search of the opportunity to vindicate a federally-guaranteed remedy of suppression, *United States v. Calandra*, 414 U.S. 338, 347–348, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974), the Petillo Rule violates the Due Process Clause of the Fourteenth Amendment as well.

It would be preferable to have no exclusionary rule at all, than to employ one under circumstances which invite easy circumvention through incontrovertible falsehoods. If we are to have such a rule, we should encourage obedience to it and punish transgressions of it. To that end, we should not eschew the time-tested rules of our adversary system, the best weapons we have to purge the false, the spurious and the fraudulent from the judicial process.[18]

It is the opinion of this Court that petitioner Petillo was denied due process of law when he was denied a full and fair hearing into his Fourth Amendment claim, and that petitioner Albanese was denied due process of law when he was denied any hearing at all into his allegations of illegal search and seizure.[19]

strictive view of the exclusionary rule it would have that Court adopt. In support of its proposal, it catalogues the destructive effects of the current rule: the liberation of criminals, the encouragement of police criminality, and perjury. Indeed, New Jersey's amicus brief effectively concedes the very premise of the instant opinion:

> Of course, it is presumed that motions to suppress are available in state courts and that these motions are decided in good faith. *The failure of a state system to provide such a remedy would be a denial of procedural due process.* . . . Again, in a pragmatic sense, the state prisoner who claims deprivation of Fourth Amendment rights is guilty. His incarceration is pragmatically just. Therefore, he should not be permitted to raise collaterally that which may well have been determined, or could have been determined, directly. *Only if the deprivation becomes one of due process should he be heard.*

Amicus Brief, at 26–27. (Emphasis added) Finally, in its presentation to the Supreme Court, New Jersey maintains "that the prosecuting authority should be permitted to introduce whatever additional information it had at the time the warrant was issued," to rehabilitate after the fact a search warrant based on less than probable cause. Amicus Brief, at 29. In a footnote, the State observes: "Indeed, where defendant asserts perjury or misrepresentation, such examination is necessary," citing *United States v. Marihart*, 492 F.2d 897 (8th Cir. 1974); *United States v. Carmichael*, 489 F.2d 983 (7th Cir. 1973), and *United States v. Dunnings*, 425 F.2d 836 (2nd Cir. 1969), *cert. denied* 397 U.S. 1002, 90 S.Ct. 1149, 25 L. Ed.2d 412 (1970), all *supra* n. 15. Amicus Brief, at 29, n. 72. Those cases, as this

Court has noted, support the proposition which the New Jersey Supreme Court rejected in *State v. Petillo*, and which the State resists here, that the subject of a search and seizure pursuant to a warrant procured by police perjury is entitled to a hearing to challenge the validity of the search.

The State of New Jersey thus finds itself in the startling posture of a litigant who simultaneously supports one position before the United States District Court and the opposite position before the United States Supreme Court.

18. As one comprehensive article observes:

> What is required is a recognition by the judiciary that police perjury can and does occur during suppression hearings. Second, the classic contexts in which perjured testimony is forthcoming should also be recognized. Third, a procedure by which to resolve the conflict of credibility must be implemented. Once the judiciary demonstrates that it will take steps to detect and deal with perjured testimony from either side, it will find the problem greatly diminished. The frequency with which the judiciary faces perjured testimony is directly proportional to its reaction to it. As demonstrated in a Chicago study, those judges who do not invariably accept such tales find that it is not often presented. Conversely, judges who blindly accept all police testimony in suppression hearings are the judges who most often receive perjury.

Sevilla, "The Exclusionary Rule and Police Perjury," 11 S.Diego L.Rev. 839, 872 (1974) (footnote omitted).

19. The state trial court stated simply that it was simultaneously denying Albanese the opportunity to be heard on the motion and the motion itself. (Tr. 5/1/72: 13) While

## IV. REMEDY

Having determined that petitioners' constitutional rights have been violated, the Court moves to the question of remedy. The State has twice asked leave to investigate the facts underlying the veracity issue in *Petillo,* once before the state court (Tr. 7/17/70: 72a) and once here. (Tr. 8/27/74: 105–106) Whatever investigations may have been conducted pursuant to these requests have been without apparent result, for each time the State elected to proceed no further.

At oral argument before this Court on August 27, 1974, the State first indicated its view that no evidentiary hearing was necessary, (Tr. 8/27/74: 75) but stated that it would not object to such a hearing. (Tr. 8/27/74: 75–76) Later in the argument, however, counsel for the State suggested that under the circumstances of the Petillo petition, an evidentiary hearing might be necessary, (Tr. 8/27/74: 100) and ultimately did request that one be conducted. (Tr. 8/27/74: 102–103) The Court then granted counsel for the State two weeks to reach a final decision on whether to request a hearing. (Tr. 8/27/74: 108–109)

By letter of September 10, 1974, the State requested an evidentiary hearing on the Petillo petition. By letter of September 17, 1974, however, that request was withdrawn.[20] The State declined a hearing in the Albanese case as well. (Tr. 10/24/74: 40)

Since this Court has determined that both petitioners were denied a full, fair and adequate hearing on their Fourth Amendment claims in state court, and in view of the State's decision to seek no hearing here, this Court has no alternative but to issue the Writs.[21]

no reason was given by the court for this action, the ruling was sustained by the Appellate Division on the ground that the Petillo Rule prohibited the granting of an evidentiary hearing. *State v. Albanese, supra,* at 2.

The suggestion was raised in the Appellate Division that the motion was also out of time under the state rules of procedure, and that no good cause had been shown for relief from the rule.

Of course, the Due Process Clause does not prohibit a state from setting reasonable time limits, even for evidentiary hearings which are constitutionally required, *see, e. g.,* F.R. Cr.P. 41(e), nor does due process require the state to disrupt its orderly pretrial and trial procedures, where those procedures provide a reasonable opportunity for the vindication of federal constitutional claims. If Judge Hayden had found that the motion was simply out of time, and not excused by the fact that the detective's self-contradictory testimony was not adduced until after the time had run, a different question of fundamental fairness would have been presented here. That, however, was not his finding. He simply found there to be no right to a hearing, and that decision was sustained on appeal on the ground that the trial judge *had* reached the merits, and that *on the merits, State v. Petillo* did not "permit defendant to introduce testimony to controvert factual assertions in the affidavit on which the search was based." *State v. Albanese, supra.*

20. The Court had told the State at oral argument that it viewed the prior findings of fact by the state judge as not supported by the record and inquired of the State whether, with this in mind, the State desired an evidentiary hearing. Tr. 8/27/74: 102, 108. Petitioner withdrew his request for an evidentiary hearing. Tr. 8/27/74: 104, at 15–16.

21. It is the opinion of this Court that an evidentiary hearing on a motion to suppress in state court does not conform to the requirements of the Due Process Clause of the Fourteenth Amendment unless the relief sought thereby is available to the moving party when its factual contentions are sufficiently proved. In the instant case, the state court effectively ruled, as a matter of law, that no matter what showing of perjury or misrepresentation Petillo had been able to make at the hearing, the issue of the veracity of Gauthier's averments was "dehors" the issue on the motion to suppress. Thus, even if Gauthier had admitted at the hearing that he had lied in his affidavit, the court would have ruled, as it later did in *Albanese,* that the issue of whether he lied was irrelevant to the motion as a matter of law. That conclusion of law was erroneous. In so ruling, the state court denied petitioner Petillo a fair hearing, as a matter of federal consti-

Writs of Habeas Corpus will issue for both petitioners, unless the State begins retrial proceedings within ninety (90) days hereof. If any evidence seized pursuant to the challenged warrants is to be offered at retrial, the trial must be preceded by a state court hearing in which petitioners are afforded a full, fair and adequate opportunity to vindicate their Fourth Amendment claims to suppression of the fruits of the allegedly illegal searches and seizures of which they complain.

tutional law, by depriving him of a reasonable opportunity to vindicate his Fourth Amendment right. That the court went on from there to make factual findings, which were not supported even by the limited hearing petitioner was afforded, does not require this Court to conduct another hearing here. The State urged the trial court to ignore the claim of perjury, first as without legal significance and second as immaterial in light of other averments in the affidavit. The trial court adopted both of these arguments. On the record here, this Court is not required to rehabilitate an improper conviction, obtained after the State limited petitioner's due process right to a fair pretrial hearing, by compelling the State to undergo a post-trial evidentiary hearing which the State itself says it does not want. *United States ex rel. McNair v. State of New Jersey*, 492 F.2d 1307 (3rd Cir. 1974).